UNITED STATES of America, Plaintiff,

v.

Orville E. STIFEL, II, Defendant.

No. C77–288 (CR68–476).

United States District Court,
N.D. Ohio, E.D.

Oct. 11, 1984.

Kevin P. Connolly, Ann C. Rowland, Asst. U.S. Attys., Cleveland, Ohio, for plaintiff.

Fred H. Mandel, Mandel & Goldsmith, Niki Z. Schwartz, Gold, Rotatori, Schwartz & Gibbons Co., L.P.A., Cleveland, Ohio, for defendant.

## MEMORANDUM OF OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO VACATE SENTENCE PURSUANT TO 28 U.S.C. § 2255

KRENZLER, District Judge.

This is an action to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. On May 1, 1969, the defendant, Orville E. Stifel, II, was convicted of willfully and knowingly mailing an infernal machine (a bomb) with the intent to kill another in violation of 18 U.S.C. § 1716, and was sentenced to life imprisonment.

In 1970, Stifel appealed his conviction. The Sixth Circuit affirmed.[1] *See United States v. Stifel,* 433 F.2d 431 (6th Cir.1970).

---

1. In his appeal, Stifel raised two major challenges. First, Stifel contended that the proofs were inadequate to support a jury verdict of guilty beyond a reasonable doubt. Reviewing the evidence supporting the jury's verdict of guilty from the point of view most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the Court concluded that the evidence against Stifel "if believed by the jury (as obviously was true in this case) was sufficient to convince reasonable minds beyond a reasonable doubt of [Stifel's] guilt." *United States v. Stifel,* 433 F.2d at 435. Second, Stifel contended that the results of Neutron Activation Analysis testing of the bomb fragments should have been ruled inadmissible. The Court ruled that it could "discover no basis for holding that test results based on neutron activation analysis are inadmissible as a matter of law or that the District Judge abused his discretion in admitting the expert witness testimony of Mr. Scott." *Id.* at 441.

Stifel served his sentence from 1969 until 1980. He was paroled in 1980.

Stifel initially filed the § 2255 petition pending before the Court on March 21, 1977. The petition, as originally drafted, sought relief based upon ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution.

In December 1977, while still in prison, Stifel filed a request through the Freedom of Information Act (FOIA),[2] seeking government documents relating to his case. As a result of this request—opposed by the government for more than a year—Stifel obtained some 1,800 pages of documents. From these documents, Stifel discovered additional grounds upon which to base his earlier filed § 2255 petition. These new grounds were that the prosecution suppressed crucial exculpatory evidence and that the prosecution knowingly presented perjured testimony in its case against Stifel. As a result of a stipulation between the parties and a subsequent order of this Court,[3] these grounds have since become the sole allegations upon which Stifel bases the § 2255 motion to vacate now before the Court.[4]

Section 2255 is the statutory habeas corpus remedy available to prisoners attacking a federal criminal sentence. In part, 28 U.S.C. § 2255 provides as follows:

*A prisoner in custody under sentence of a court* established by Act of Congress *claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.* A motion for such relief may be made at any time.

Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. *If the court finds that* the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that *there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside* and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

(Emphasis added.)

In order to prevail on a § 2255 motion, the petitioner has the burden of proving by a preponderance of the evidence that his constitutional rights were denied or infringed. *Wright v. United States*, 624 F.2d 557 (5th Cir.1980); *Crail v. United States*, 430 F.2d 459 (10th Cir.1970).

In his § 2255 motion, Stifel alleges that he was denied a fair trial in violation of the Fifth Amendment to the United States Constitution because the prosecution failed to divulge to the defense material, exculpatory evidence which the prosecution possessed. Additionally, Stifel alleges that he was denied a fair trial because the prosecution allowed a government witness to perjure himself on the witness stand.

---

**2.** 5 U.S.C. § 552.

**3.** These grounds were originally raised in defendant's motion for bail filed January 19, 1979. On September 20, 1979, the parties entered into a stipulation to include these grounds in the earlier filed § 2255 motion. On January 27, 1984, the government attempted to withdraw from this stipulation. By endorsed order of this Court, the motion to withdraw was denied on February 7, 1984, and the motion to vacate was officially amended to include these new grounds.

**4.** At the hearing before this Court, Stifel officially abandoned the original grounds of ineffective assistance of counsel asserted in the original § 2255 motion.

In accordance with 28 U.S.C. § 2255, and Rule 8 of the Rules Governing § 2255 Proceedings, 28 U.S.C. foll. § 2255,[5] this Court held an evidentiary hearing on the matter. Both parties presented exhibits and witness testimony. The hearing was held in June and July of 1984.

This matter is now in a posture for this Court to "determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255.

As the resolution of defendant's claims depends upon a comparison of the evidence presented at trial with that revealed at the hearing, a thorough review of each of those proceedings is necessary to decision in this matter. Therefore, this Court will proceed to review the evidence presented at trial, the defendant's claims, the evidence presented at the hearing, and the controlling legal standards, and will conclude with an application of those standards to the facts in this case.

### I. *The Evidence at Trial.*

Stifel was convicted for having sent an infernal machine (a bomb) through the mail, thereby causing the death of Daniel J. Ronec. At the time of the bombing, Stifel was 21 years old, Ronec was 24.

The bomb was delivered with the mail on July 8, 1968, at the Lorain, Ohio, home of Daniel Ronec's mother. It came in a cardboard cylindrical mailing tube with a screw-on metal lid, the removal of which detonated the bomb. Ronec apparently unscrewed the lid and the bomb exploded, killing him instantly.

At Stifel's trial, the prosecution's case focused on Stifel's motive, access to materials, and ability to construct the bomb. The evidence against Stifel was almost entirely circumstantial.

The prosecution's case against Stifel began with the premise that the bomb was addressed to Daniel Ronec, the fiance of Stifel's former girlfriend. That the bomb was addressed to Dan Ronec was never directly proved because the address label had been destroyed along with the rest of the bomb. The fact that Dan Ronec opened the bomb package created the inference that it was addressed to him. In addition, Herbert G. Harding, the mailman who delivered the package, testified that it had been addressed to Dan Ronec.

Harding was the only witness who remembered seeing the package and purported to be able to describe it. On direct examination, he described it as being addressed to Dan Ronec and bearing two addresses. One was a Columbus address, typed on an address label and cancelled with the mark of a black felt-tip pen. The other was the Lorain address, hand printed on the package with the same type of pen as was used to cancel the Columbus address.

Although Harding testified on direct examination that the package was addressed to Dan Ronec, he admitted on cross-examination that in his first sworn statement to Postal authorities he had said it was addressed to Dan's brother, Thomas Hronec. Thomas Hronec had lived at the Lorain address until 1960, when he moved out of state. When asked to explain this discrepancy on redirect, Harding testified that when he thought it over, he realized that Tom had never lived in Columbus, but that Dan had. Harding also stated that he had not delivered mail for Tom at the Lorain address since Tom had moved away in 1960.

Susan Hronec, Dan and Tom's mother, testified that Dan had only been living at her house in Lorain for about a month when the bombing occurred. The previous year he had lived in Cleveland where he had just finished his first year of teaching high school. Prior to living in Cleveland, he had lived in Columbus, Ohio, where he

---

**5.** In pertinent part, Rule 8 provides as follows:
   **Rule 8. Evidentiary Hearing**
   **(a) Determination by court.** If the motion has not been dismissed at a previous stage in the proceeding, the judge, after the answer is filed and any transcripts or records of prior court actions in the matter are in his possession, shall, upon a review of those proceedings and of the expanded record, if any, determine whether an evidentiary hearing is required....

attended Ohio State University as a graduate student.

As to Stifel's motive, the prosecution's theory was that Daniel Ronec was the victim of Stifel's jealousy and rage at being spurned by Ronec's fiance, Cheryl Jones. Jones and Stifel had met in the fall of 1965, before Jones knew Ronec. At the time, Stifel was a sophomore at Ohio University in Athens, Ohio, Jones a freshman at Ohio State University in Columbus. The two campuses being 80 miles apart, the year-long relationship of Jones and Stifel involved voluminous letter writing and frequent weekend visits. The relationship ended in November of 1966 when Jones had already been seeing Ronec for about a month.

The prosecution's "jilted-suitor" theory was supported by Jones' testimony and the letters written by Stifel to Jones during and immediately after their relationship. Jones testified that after she broke off with Stifel, Stifel had sought her out on the Ohio State University campus, and sent letters to her expressing his hurt and rage and vowing to get her back. Jones further testified that, after the breakup, Stifel had once phoned her to tell her he had been on his way to Columbus to "shoot her and whoever [sic] she was with" but that on the way he had been stopped by the police because of a note he had left with his roommate indicating what he intended to do. Jones testified that she did not tell anyone in authority about this incident because she did not believe Stifel would hurt her. The prosecution relied upon this incident as indicating a threat by Stifel to kill Ronec. Jones testified that Stifel knew about Ronec and that she and Ronec had once seen Stifel at a Columbus restaurant where Stifel and Ronec "exchanged stares."

The letters written by Stifel further supported the prosecution's theory that Stifel was deeply hurt and enraged at the breakup.

At trial, however, the defense emphasized that the break-up had occurred, and the letters had been written in late 1966, at least 18 months before the bombing death of Ronec. This fact, the defense insisted, significantly weakened the causal connection between Stifel's motive and the crime.

Cheryl Jones testified that in early 1968 she had written to Stifel telling him that she and Dan were to be married in August 1968. Stifel responded to this letter with a "very cordial and friendly letter" congratulating Jones and Ronec on their wedding plans.

Larry Meehan, a friend of Stifel's, testified that in May or June of 1968, he drove with Stifel to Columbus so that Stifel could use the Ohio State library. While there, Meehan testified, Stifel decided to write a note to Dan Ronec and have Meehan deliver it at the apartment where Stifel believed Ronec was living. Meehan attempted to deliver the note but, finding the apartment vacant, returned it to Stifel.

Stifel testified that he sent the note because he was reminded of Jones when he got to Columbus. He said that he could not find her address so he sent it to Dan instead. The note, he said, was a friendly note wishing Jones and Ronec luck in their wedding. After Meehan returned it to him, Stifel said, he never sent it.

Other evidence revealed that the Ohio State student directory—widely available throughout the campus including at the library—listed as addresses for Daniel Ronec both the Columbus address and his mother's Lorain address.

The remaining evidence in the prosecution's case bore upon Stifel's ability to fashion the bomb and access to materials of the type used in making the bomb.

As described by Harding, the mailman, the bomb was a six-inch long cardboard mailing tube with a dark lacquered surface. From the scene of the explosion, investigators had recovered enough fragments to determine the bomb's components. A switchcraft switch had been used to trigger the mechanism, and it was believed that military C–3 or C–4 explosives had been used rather than gunpowder. The investigators also recovered fragments of tape, a mailing label, cardboard, a metal lid, and

pennies, all of which were believed to have been used in the bomb.

Testimony of the government witnesses indicated that the bomb was made by someone who knew what he or she was doing.

The prosecution did not have direct evidence that Stifel had the requisite knowledge or skill to make a bomb. It did, however, produce evidence indicating that Stifel had a longstanding interest in firearms and explosives and that Stifel's father kept tools and machinery on the premises where Stifel and his family resided. The prosecution did not introduce evidence to show where Stifel might have obtained C–3 or C–4 explosives.

The Stifel residence was searched in August of 1968. Among the items found in Stifel's room or the adjoining closet and introduced at trial were a jar of pennies, several out-of-town newspapers reporting the bombing, a catalogue listing the Switchcraft switch, a gun, gunpowder, and felt tip pens.

Items were also obtained from the storeroom of Proctor and Gamble (P & G) in Cincinnati where Stifel worked as a consumer products tester from April 1968 until October 1968. The storeroom, located about 100 feet from Stifel's work area, yielded red tape, mailing labels, and cardboard mailing tubes with metal lids, each of which was tested by government scientists and introduced into evidence at trial.

The government scientists used two types of scientific testing to compare the materials recovered from the P & G storeroom with the fragments of material recovered from the bomb scene. First, the materials were compared by examination with a microscope, and determined to be "microscopically similar." Second, the materials were subjected to Neutron Activation Analysis (NAA), a procedure whose value was seriously contested at trial in a battle between the experts.

James Scott was the government's expert witness who performed the NAA test-

ing. He testified that as a result of this procedure he believed that the fragments of tape, metal, and labels were of the same type and manufacture as those taken from the P & G storeroom. He further testified that the tape and metal were from the same batch as those fragments recovered from the bomb scene.

Evidence at trial revealed that each of the products tested was widely available throughout the country. The particular batch of tape, however, had only been distributed to two businesses: P & G and one other Cincinnati firm.

Throughout the presentation of its case, and in closing arguments, the prosecution insisted that Stifel was the only person who could have committed the crime. Realizing that the government's case was based almost entirely upon circumstantial evidence, the prosecutor stressed that "[t]hings were checked and rechecked and double checked and triple checked and always came back to Orville Stifel."

This characterization was reinforced by the trial judge who, when the jury reported itself deadlocked, charged the jury to continue its deliberations until a verdict was reached because there was not "... any reason to believe that the case can be tried again by either side better or more exhaustively than it has been tried before you ... or that more or clearer evidence could be produced on behalf of either side."

II. *Defendant's Claims.*

In his § 2255 motion to vacate, defendant makes four specific claims. These are as follows:

1. The prosecution suppressed material, exculpatory evidence tending to show that Andrew Roen,[6] the father of the victim, Daniel Ronec, was the sender of the bomb instead of Stifel.

2. The prosecution suppressed material, exculpatory evidence that, when first interviewed by Postal Inspectors, Cheryl Jones was definite in her defense of Sti-

---

**6.** The family name was originally spelled HRONEC. Dan Ronec changed to the RONEC spelling shortly before his death. Susan—Dan's mother—and Tom—Dan's brother—retained the original spelling. Andrew changed his name to ROEN, but is sometimes referred to (or refers to himself as) HRONEC.

fel, stating that she had no reason to suspect him of sending the bomb, and stating that Stifel had never made any threats against her boyfriend's—Ronec's —life.

3. The prosecution suppressed material, exculpatory evidence in the form of the results of an investigation tending to show that neither Stifel nor his father had purchased a switchcraft switch either through the mail or at any local retail outlet.

4. The prosecution knowingly used perjured testimony from government witness, James Scott.

### III. *The Evidence at the Hearing.*

At the hearing before this Court on defendant's § 2255 motion to vacate, defendant offered documents from the government files obtained through the FOIA, and his testimony as to having obtained them. The government presented extensive testimony of persons involved in the investigation and prosecution of Stifel, as well as testimony and exhibits tending to counter information revealed in the FOIA documents.

### (1) *The Andrew Roen Evidence.*

Andrew Roen was the father of the victim, Daniel Ronec. The FOIA documents indicate that during the investigation Andrew Roen was, for a time, the chief suspect in the bombing.

According to the reports, Andrew Roen was divorced from the victim's mother, Susan Hronec, in 1953. Immediately after the divorce, Roen was reported to have painted obscenities all over the Lorain house. Roen's bitterness apparently did not subside in the ensuing years. He neglected the boys, Tom and Dan, and sent vicious and threatening letters to his ex-wife. Among these were an extortionate letter formed with words cut from a newspaper, and letters making threats such as "wish you were dead" and "I'll be at your funeral." The year before the bombing, Roen sent his ex-wife a birthday card saying "I can't wait until you die." In 1968, Roen reportedly purchased a handgun

which he allegedly planned to use to "shoot those people in Lorain"—his former family.

The investigatory reports reveal that Roen's animosity was directed, not only at his ex-wife, but also at his son, Tom, and his former brother-in-law, Steven Breznen. Tom had moved away from the Lorain family home in 1960, but Roen was unaware of this fact. At the time of the bombing, both Susan Hronec and Steve Breznen lived at the Lorain address with the ill-fated Dan. The reports indicate that when interviewed by the postal authorities, Steve Breznen provided them the following telegram received during the month before the bombing:

STEVE BREZNEN—
224 WEST 32 ST LORAIN OHIO
—I WANT FIVE THOUSAND DOLLARS CASH WITHIN THIRTY DAYS FOR MY SHARE OF MY HOME OR YOU SUFFER THE CONSEQUENCES, OK? MAKE OUT THE CHECK FOR ANDREW HRONEC 1240 ALLEN COURT ROCKY RIVER OHIO. MAY THEN LEAVE YOU ALONE—
ANDREW HRONEC.

(DFA, p. 3). The report reveals that, after showing the investigators this telegram, Steven Breznen remarked: "That bomb was meant for me and instead he killed his own son." *Id.*

Defendant's evidence also suggests that Andrew Roen may have had access to the type of explosives believed to be used in making the bomb. As indicated earlier, the government's experts testified at trial that the bomb had been made with a military electric blasting cap, and probably with a military C–3 or C–4 explosive. At defendant's trial, the government never offered an explanation as to where defendant might have obtained such explosives.

The investigatory reports introduced at the hearing reveal that Andrew Roen was a merchant seaman who sometimes served aboard military ammunition ships hauling explosives to Vietnam. On June 21, 1968, seventeen days before the bombing, Roen signed on the SS U.S. Pilot as first engineer. The Pilot left Sunny Point, North

Carolina, on June 21, 1968, carrying cargo of ammunition destined for Qui-Nhon, South Vietnam. The ship arrived in the Panama Canal Zone on June 26, 1968, and departed June 28, 1968, during which interval Roen would have been able to leave the ship in the Canal Zone. Minutes of a meeting between postal investigators indicate that if a package had been dropped in the mails in the Canal Zone during that stopover, it would have arrived in Lorain, Ohio, at just about the time the bomb did. The documents also indicate that the Canal Zone stop was the only such stop scheduled for the ship until it reached Subic Bay, Phillipines, some 35–40 days later.

The postal documents also reveal certain statements reported to have been made by Andrew Roen to his second wife which suggest a consciousness of guilt. An initial cablegram instructed:

> Not guilty—Keep your mouth shut. Wire results.

(DFQ). In a subsequent letter, Roen wrote:

> So what are you panicky about, eh? Because somebody squealed, eh? So what? I have peace of mind. I don't give a damn for anything. I got aboard this ship June 20 so what more proof do I need, eh? I am on the way to Subic Bay for 39 days out in the Pacific. Why are you shook up. Even scared to write a letter to me. People have to have peace and Goddam—before they can accuse anyone so I don't know nothing about it and I have no reasons to get shook up about it. So that's enough of that then.

(DFO, p. 14).

To rebut the defendant's evidence indicating that Andrew Roen might be the perpetrator of the crime, the government sought to show two things: first, that the defense did have knowledge that Andrew Roen was a suspect, and, second, that the Andrew Roen evidence is not sufficient to create a reasonable doubt as to Orville Stifel's guilt.

■ As proof that the defense was aware of Andrew Roen as a possible suspect, the government introduced copies of newspaper articles appearing in Cleveland, Lorain, and Cincinnati in 1968, each of which state in very general terms that investigators were tracking down the whereabouts of Andrew Roen.[7] Additionally, United States Attorney Bernard Stuplinski testified that he was aware of the Andrew Roen investigation,[8] that he generally followed an "open file" policy with the defense counsel, and that he recalled having at least one or two pretrial conferences with Stifel's attorney. Stuplinski, however, could not remember whether he specifically told defense counsel that Andrew Roen was a suspect or about the facts implicating Roen.

Stifel testified that he did not know that Roen was a suspect and that he certainly was unaware of all the facts implicating Roen.

On the issue of whether the Andrew Roen evidence was sufficient to create a reasonable doubt as to Stifel's guilt, the government offered testimony and exhibits attempting to show that Andrew Roen could not have committed the crime.

First, to discredit the theory that Andrew Roen could have mailed the bomb from the Canal Zone, the government offered the testimony of Edward Wardlow and Herbert G. Harding. In 1968, Wardlow was an

---

7. For instance, the *Lorain Journal* of July 10, 1968, stated:

   The father, Andrew, is a lake freighter seaman believed to be presently aboard ship. Police have been unable to locate him... Inspector Maurice Munford said today that there is no definite evidence linking Ronec with the death of his son... "We merely want to talk to him," Mumford said.

   (Govt.Ex. 7a).

   The Cleveland *Plain Dealer* of October 26, 1968, reported that the bomb investigation "ranged across nine states, Panama and the Phillipine Islands...." (Govt.Ex. 8a). The other references to Andrew Roen were equally vague.

8. Even if the prosecutor had not personally known of this evidence, the knowledge of other government law enforcement personnel might be imputed to the prosecution. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Smith v. Florida,* 410 F.2d 1349 (5th Cir.1969); *Barbee v. Warden,* 331 F.2d 842, 846 (4th Cir.1964); *Evans v. Kropp,* 254 F.Supp. 218 (E.D.Mich.1966).

employee of the Panama Canal Zone Postal Service. He testified that packages leaving the Canal Zone would contain two markings: a red ball stamp and a black wavy-line cancellation mark. Both stamps would contain the words "Canal Zone." Wardlow also stated that a package leaving a United States ship would contain either the ship's return address or a stamp noting "Postage Due." On cross, Wardlow stated that stamping and inspecting of parcels was done manually, and agreed that human error could occur.

Harding testified that the bomb package carried domestic postage—a Thomas Payne 40-cent stamp—and that it did not bear a red ball stamp, a return address, or the words "Postage Due."

Second, the government offered testimony of Joseph Walton and Inspectors Givens and Moore to show that Roen did not have access to explosives or military electric blasting caps. Joseph Walton was, in 1968, a Marine Cargo Specialist, whose duties involved supervising the loading of vessels bound for Vietnam. Walton testified that C–3 or C–4 explosives could have been part of the cargo of the SS U.S. Pilot in its June-July 1968 voyage. He explained how the cargo was loaded and secured, the basic objective of which was to insure that the cargo did not move while the vessel was in transit. He indicated that the ammunition crates bore markings identifying the cargo by code.

Testimony of Inspectors Givens and Moore and copies of reports made at the time of the investigation indicate that, when interviewed, the ship's captain had no knowledge either of Roen having access to explosives and blasting caps or of the ship's cargo having been tampered with during the voyage. The captain, moreover, did not think that Roen had access to the code identifying the cargo's contents.

Third, the government offered evidence to show that Andrew Roen did not have the ability to manufacture the bomb. Anthony Tarquino, one of Roen's supervisors on the U.S.S. Pilot in 1968, testified that Roen's duties involved daily maintenance of the ship such as plumbing, and that Roen had a noticeable "tremor" in his hands. On cross, Tarquino stated that Roen had a private room on the ship and that he brought personal baggage on board, the contents of which Tarquino had no personal knowledge.

To indicate Roen's clumsiness with equipment, the government offered a statement of Roen's second wife to the effect that when Roen bought a gun he was unable to get the magazine into it.

In addition to the above, the government sought to prove Andrew Roen's lack of motive by showing, again, that the bomb was addressed to the victim, and not to another member of the family. The government sought to explain the "guilty" telegrams sent by Roen to his second wife by showing that they were sent after both Mrs. Roen and the ship's captain had been interviewed by investigators and had told Roen that he was a suspect in the bombing.

### (2) The Cheryl Jones Statement.

At the trial, Cheryl Jones testified that, some 20 months before the bombing, Stifel had phoned her threatening to shoot her and whomever she was with. The government contended that this constituted a threat against Dan Ronec, Jones' new boyfriend, evidencing hatred and jealousy on defendant's part. All along, Stifel has contested the occurrence of this threat.

The investigatory documents acquired by Stifel through the FOIA reveal that, on the day after the bombing, Jones was interviewed by postal inspectors and asked if she would consider Stifel a suspect in the bombing death of her boyfriend. In response to the question, the report indicates, Jones said she did not consider Stifel a suspect. The report continues as follows:

> JONES was definite in her defense of STIFEL and stated that she has no reason to suspect STIFEL of this and further when asked if STIFEL ever made any threats against her boyfriend's life, she stated "no."

(DFA, p. 4).

Stifel contends that this is a prior inconsistent statement which the prosecution should have revealed to the defense.

To show that the defense knew or should have known of this statement, the government again offers articles from Cleveland and Elyria newspapers. The July 11, 1968, *Plain Dealer* reported that "Miss Jones ... reportedly denied that a former suitor had threatened to kill anyone who married her" (Govt. Ex. 8b). Again, the government offers Stuplinski's testimony regarding his "open file" policy as evidence that, if he had the information, he would have let the defense know about it.

To rebut the impact of the Jones' statement, the government offered evidence that when she gave it she was heavily sedated and had been receiving numerous calls from the press.

The government also offered evidence that any perceived inconsistency would have been explained by Jones' later statement to postal inspectors the same day, revealing the 1966 telephone call. Additionally, the government maintained that the prosecution could have called Jones' former roommates as witnesses to rebut any charges that Jones' testimony about the phone call was a recent fabrication.[9]

### (3) *The Switchcraft Investigation Results.*

At the trial, the prosecution introduced into evidence an Allied Electronics catalogue which had been seized from defendant's home in Cincinnati. The catalogue contained a listing for the type of Switchcraft switch used in the bomb. The prosecution therefore introduced the catalogue to create the inference that defendant had recently purchased a Switchcraft switch like that used in the bomb.

Defendant's evidence at the hearing shows that the postal investigators sought to discover whether defendant had purchased a switch, and that the results of such investigations were negative:

Contact was made at Allied Electronics on August 5 & 6, 1968, with Mr. Dave Hansen, Security Officer. Mr. Hansen checked for sales of FF 1002 switch all consumer accounts, all Industrial and dealer accounts, index records (all customers cash and credit) and catalog mailing lists with negative results for any sales to Orville E. Stifle [sic] or father with negative results. All retail telephone orders for past ninety days were also negative.

(DFE, p. 2). A second report also indicates that sources checked in Illinois and Cincinnati were negative as to purchases being made by Stifel (DFO, pp. 10–11, ¶ 32–34).

The government offered evidence that these results are not conclusive. Specifically, one postal investigation report states that the switch was commonly used in door alarm systems and model aircraft. Additionally, the results of investigations offered by defendant only covered the 90 days preceding the bombing, and only related to purchases made by Stifel or his father, and not his friends.

### (4) *The James Scott Testimony.*

Defendant alleges that James Scott's trial testimony is false and misleading because it is inconsistent with statements made by Scott in a meeting with the United States Attorney and the postal inspectors before defendant's trial (See DFD).

The trial testimony of James Scott involved Neutron Activation Analysis (NAA) testing that Scott had performed comparing fragments of tape, metal lids, cardboard, and labels from the bomb scene with samples of those items taken from Proctor and Gamble where Stifel worked.

Scott testified that through NAA he could determine that the bomb scene samples could have come from the P & G storeroom. He stated that each of the bomb scene fragments tested was of the "same manufacturer" as its P & G counterpart. He further testified that the metal from the bomb scene came from the same "batch" of metal as that used in the lids taken from P & G. Each of these conclusions, while relevant, was of little actual

---

**9.** At trial, Cheryl Jones testified that she told her roommates about the phone call "threat" from Stifel.

significance because all of the items in question were mass produced by the hundreds of thousands and distributed to their respective manufacturers throughout the world. The batch of metal, similarly, had been used to produce numerous metal lids distributed throughout the United States.

As to the tape, however, Scott testified that not only were the P & G and bomb scene tapes both made by the same manufacturer—Plymouth Rubber Company—but they were also from the same *batch.* The evidence at trial showed that this batch of tape contained only about 4,400 rolls, and was distributed to only two companies: P & G and another Cincinnati firm.

Defendant now contends that the documents recovered through the FOIA reveal that Scott's testimony was false and misleading and that the prosecution knew or should have known of its falsity.

The document which defendant offers to support the perjury allegations is a transcript, dated April 9, 1969, of a meeting between Scott, prosecutor Stuplinski, and several postal inspectors (DFD). Testimony at the hearing reveals that the notes were the typed rough draft of shorthand notes taken by Wanda Pagel, then "domicile clerk" for the postal inspectors.

The government vigorously contests the accuracy of these notes. At the hearing, the government offered the testimony of a number of participants in the meeting, all of whom doubted the notes' accuracy. Most significant of these was Wanda Pagel. Pagel testified that the notes were taken at a large meeting with many people talking, that she could not hear everything being said, and that she did not understand the subject matter.

To rebut the government's evidence as to inaccuracy of the notes, defendant offered a rough draft of the defense's closing argument, prepared by Pagel, and notable for its substantial accuracy.

In substance, the defendant makes two allegations of perjury by Scott:

(1) Scott perjured himself when he said that he had only tested two samples of tape in connection with the case.

(2) Scott perjured himself when he said he could identify the tape by batch.

The first of these allegations is based upon the following testimony given by Scott at defendant's trial:

Q: Referring, now, to Government's Exhibit No. 58 which, I believe, was your chart on the test run on the red tape, could you tell us, *how many different types of tape you used in this test*?
A: *In this particular examination, you mean*?
Q: *Yes.*
A: *Just the two tapes* that there is reference to there.
Q: By that you mean fragment, Exhibit No. 38, taken from the scene of the explosion, and Exhibit 28, which was a roll of tape right there on your right taken from the P & G storeroom. Is that correct?
A: That is correct.
(Cr.Tr. 414–415). (Emphasis added.)

\* \* \* \* \* \*

Q: On your test on the red tape, I believe you testified that the only sample you used was the fragmentation found, which was Exhibit 38, and also one piece from Exhibit 28, which was the roll of tape from Procter and Gamble which was sent to you in Washington, is that correct?
A: That's correct.
Q: You also testified that these two were from the same manufacturer and from the same batch?
A: Yes, sir.
Q: Is that correct: [sic]
A: That is correct.
Q: *If you had received a roll of tape from another* place in Cincinnati, or Indiana, or Kentucky, *and it was from the same batch*, same manufacturer—Plymouth; I think it is Plymouth Rubber Company in Massachusetts—*would you have achieved the same results*?
A: Possibly.
Q: Possibly? Or probability or in actuality, Mr. Scott?

A: *Well, I don't know. I didn't run it, so I can't say.* It is possible.

(Cr.Tr. 420). (Emphasis added.) Defendant interprets this testimony to mean that Scott made no other tests in connection with the trial.

The evidence at the hearing reveals that in November 1968, subsequent to his tests comparing the bomb scene and P & G samples, Scott obtained additional tape samples from Plymouth Rubber Company in Massachusetts. Scott testified that he obtained and tested these in order to confirm the original batch conclusion drawn in the earlier test.

The second allegation is based upon the undisputed fact that at trial Scott said he could identify tapes by batch, and that the tape samples from the bomb scene and P & G came from the same batch.

Defendant maintains that the following statements made by Scott before trial indicate that he could not identify the tape by batch and that therefore he lied at trial:

*STUPLINSKI:* So then, the tape that was found at the bomb site, you can see it has the same elements as the tape from P & G ... are identical components. Could be also identical to tapes found all over the country. *What good is the examination you are telling us about?*
*SCOTT: That is about all you can say.* It is the same tape from P & G.
*STUPLINSKI:* You are saying the same manufacturer.
*SCOTT:* You say the tapes have the same elemental composition. We can tell the difference in manufacturers. We can make a distinction.

   \*    \*    \*    \*    \*    \*

(DFD, pp. 2–3). (Emphasis added.)
*STUPLINSKI:* Can you determine if ... paint came from the same can?
*SCOTT:* It would vary under certain conditions. Naturally, you consider the area the paint was used.
*DIBOWSKI:* Like a different batch from the same manufacturer?
*SCOTT: We went up there and ran different tapes and labels and they were found to be fairly close. I can't*

*really say they came from the same batch. You find quite a bit of variances. Due to the fact that this is a continuous thing you rarely have differences in batches. It's continuous ....*

   \*    \*    \*    \*    \*    \*

*FARRELL:* When you went with Bill and Bob to Mass. [sic] and ran samples it was physically the same.
*SCOTT:* Let him ask that. After running this ... it wasn't a good collection. It could have been from all the same batch.

(DFD, p. 4). (Emphasis added.)

Scott testified at the hearing that he had not lied at the trial and that he could, in fact, identify the tape by batch. When asked about the results of the November 1968 tests, Scott testified that they confirmed the conclusions drawn in the comparison of P & G and bomb scene tapes. Later, however, Scott engaged in the following dialogue with defense counsel:

Q Just so I understand correctly, Mr. Scott, your explanation of the interpretation of the language attributed to you at the top of page 4 on Government's Exhibit 18, when you said, "I can't really say they came from the same batch," you say that probably is referring to the various samples that you collected in November at the Plymouth Rubber Company?

A Yes, sir.

Q Because they didn't know at Plymouth, they didn't have their tapes segregated by batch?

A Yes.

Q So you got no guidance from that as to what was from what batch?

A Yes; right.

Q *And based on that, you couldn't tell among the tapes you got whether they were from the same batch or two different batches or God knows how many different batches; right?*

A *Yes; that is correct.*

Q Okay; and that is explained then in the next sentence, and you say, "You find quite a bit of variance. Due to the

fact that is a continuous thing, you rarely have differences in batches"; right?

A Right.

Q *So that it wasn't really possible with tapes that you knew came from the Plymouth Rubber Company to determine whether the tapes were from the same or different batches based on your November tests ?*

A *Only those that we were actually able to take from a batch which we knew beforehand.*

(H.Tr. 115–116). (Emphasis added.)

### IV. *The Government's Rule 9(a) Motion to Dismiss.*

As a preliminary matter, this Court needs to address the government's motion to dismiss.

On March 19, 1984, the government renewed an earlier-filed motion to dismiss [10] based upon Rule 9(a) of the Rules Governing § 2255 Proceedings, 28 U.S.C. foll. § 2255.

Rule 9(a) provides as follows:

**(a) Delayed motions.** A motion for relief made pursuant to these rules may be dismissed if it appears that the government has been prejudiced in its ability to respond to the motion by delay in its filing unless the movant shows that it is based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the government occurred.

All of the claims now before the Court arise from evidence contained in government documents which Stifel obtained through the FOIA in 1978. Stifel filed his request for documents through the FOIA in December 1977. He first raised the issues now before the Court in January 1979,[11] ten years after his conviction.

The government argues it has been prejudiced by the delay because of fading memories and deaths of potential witnesses. The government argues that Stifel should have first asserted his right to FOIA documents in 1975 when the pertinent amendments to the FOIA first became effective.[12]

In *Davis v. Adult Parole Authority*, 610 F.2d 410, 413 (6th Cir.1979), the Sixth Circuit stated that because of Rule 9(a)'s "potentially devastating impact on the availability of habeas relief to ... petitioners, *it must be carefully and liberally construed.*" (Emphasis added.) The Court fashioned a two-prong test in which the government must show that it is prejudiced in its ability to respond to the claims raised, and the petitioner must be given an opportunity to meet or rebut the government's showing. *Id.* at 414. The Court noted that the 14-year delay in *Davis* created a presumption of prejudice to the government's ability to respond, and that the burden shifted to the defendant to rebut that presumption. *Id.* at 415–416. In a footnote, the Court indicated that "[t]o state that petitioner must rebut the 'presumption' of prejudice is merely to say that he has a heavier burden of establishing a constitutional violation." *Id.* at 416, n. 13.

The Sixth Circuit has subsequently noted that "the language of Rule 9 is permissive rather than mandatory and leaves within the discretion of the court the decision of whether a delayed petition is to be dismissed." *Berry v. Mintzes*, 726 F.2d 1142, 1146 (6th Cir.1984).

In the instant case, this Court finds that until defendant received the FOIA documents, he had no knowledge of the evidence asserted herein. Thus, the FOIA being the key to his discovery of this evidence, the earliest he could have discovered it was in 1975 when the relevant provisions of the Act became effective. This Court believes that the filing by defendant of a FOIA request in 1977 constituted reasonable diligence on his part. Moreover, the prejudice caused to the government by

---

**10.** The government originally filed a Rule 9(a) motion to dismiss on April 21, 1977. At the time, the motion was addressed to defendant's earlier, but since abandoned, claims of ineffective assistance of counsel. The motion to dismiss now before the Court is addressed to the later raised claims of suppression of evidence.

**11.** See footnote No. 3.

**12.** 12 U.S.C. § 552(b)(7); 5 U.S.C. § 552a.

deaths and fading memories has not been shown to be causally connected to the two-year period between the Act's effective date and the filing of the request. The government cites as prejudicial the deaths of Andrew Roen and Steve Breznen, but neither have been shown to have occurred during that period. Finally, the defendant correctly points out that since the prosecution is under a continuing duty to apprise the defense of exculpatory evidence, *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the equitable doctrine of laches encompassed by Rule 9(a) estops the prosecution from seeking to bar the claims presented here.[13]

### V. *The Legal Standards: Constitutional Right to a Fair Trial.*

■ Implicit within the Fifth Amendment guarantee that the government shall not deprive a person of life, liberty, or property without due process of law, is the guarantee of a fair trial to criminal defendants. This guarantee imposes upon the prosecution a duty to reveal to the defense evidence tending to exculpate the defendant. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

■ In *United States v. Agurs*, the Supreme Court described three tests for determining whether, by failing to disclose exculpatory evidence, the prosecution has violated defendant's right to a fair trial. Two of these tests are applicable here.[14]

■ In the first situation, the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony, the existence of which the prosecution knew or should have known. In this situation, the conviction "must be set aside *if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.*" *Id.* at 103–104, 96 S.Ct. at 2397–2398. (Emphasis added.) This standard recognizes that a conviction achieved using perjured testimony is fundamentally unfair. For purposes of this standard, "false" testimony has been interpreted to include that which is materially misleading. *United States v. McClintic*, 570 F.2d 685, 692 (8th Cir.1978).

■ The second situation exists when the defense has made no request at all, or merely a general request for all exculpatory materials. In this situation, the prosecution's failure to divulge exculpatory evidence constitutes a denial of defendant's right to a fair trial *if the omitted evidence creates a reasonable doubt that did not otherwise exist. United States v. Agurs*, 427 U.S. at 112, 96 S.Ct. at 2401.

This standard was fashioned to reflect our legal system's overriding concern with the justice of the finding of guilt. It recognizes that the prosecutor is "the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer." *Id.* at 110–111, 96 S.Ct. at 2400–2401.

The Court in *Agurs* described implementation of this standard in the following terms:

---

13. The government contends that Chief Justice Burger's dissent in the denial of certiorari in *Spalding v. Aiken*, 460 U.S. 1093, 103 S.Ct. 1795, 76 L.Ed.2d 361 (1983), requires granting the motion to dismiss in this case. This Court does not agree. In *Spalding v. Aiken*, the Chief Justice, concerned with the potential abuse involved in claims presented years after the conviction, stated:

> I would allow summary dismissal of habeas petitions when the state can prove that the lapse of time has made reprosecution impossible. *Exceptions should be limited to cases where the petitioner can make a colorable claim of innocence, demonstrate that a significant miscarriage of justice has occurred or show that his claim is based on grounds that,*

> *with the exercise of reasonable diligence, could not have been discovered earlier.*

(Emphasis added.) This Court believes that all three exceptions apply in the instant case. By sustaining his burden of showing that the evidence suppressed created a reasonable doubt that did not otherwise exist, *see infra*, defendant has presented a colorable claim of innocence and has demonstrated a significant miscarriage of justice.

14. The third test applies when the defense has made a *specific* request for exculpatory evidence. In this situation, the conviction must be reversed if the evidence suppressed "might have affected the outcome of the trial." *United States v. Agurs, Id.* at 105, 96 S.Ct. at 2398.

This means that *the omission must be evaluated in the context of the entire record.* If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, *if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.*

*Id.* at 112–113, 96 S.Ct. at 2401–2402. (Emphasis added.)

■ Since *Agurs* requires the omissions to be evaluated in the context of the entire record, it follows that the effect of all the omissions must be considered cumulatively:

[T]he effect of each non-disclosure must not only be considered alone, for *the cumulative effect of the nondisclosures might require reversal even though, standing alone, each bit of omitted evidence may not be sufficiently "material" to justify a new trial.*

*United States ex rel. Marzeno v. Gengler,* 574 F.2d 730, 736–737 (3rd Cir.1978). (Emphasis added.) In this context, this Court "cannot merely consider the evidence in the light most favorable to the government but must instead evaluate all the evidence as it would bear on the deliberation of a factfinder." *Cannon v. State of Alabama,* 558 F.2d 1211, 1214 (5th Cir.1977).

Thus, in the instant case, this Court must examine the evidence presented at the trial along with all the evidence which the defendant alleges the prosecution unlawfully withheld, and determine whether this new evidence, considered cumulatively, creates a reasonable doubt that did not otherwise exist,

## VI. *Findings of Fact and Conclusions of Law.*

■ This Court, having reviewed in depth the evidence presented at the hearing and the trial, concludes that defendant has sustained his burden of proving that he was denied a fair trial in violation of the Fifth Amendment to the United States Constitution. Specifically, this Court finds that the combination of the evidence implicating Andrew Roen, the Cheryl Jones statement, and the results of the Switchcraft investigation was sufficient to create a reasonable doubt that did not otherwise exist in the prosecution's mostly circumstantial case against Stifel.

Defendant has shown by a preponderance of the evidence that the defense was unaware of the evidence discovered through the FOIA. Although the government has argued that the defense knew of the items withheld, the evidence does not support this conclusion. The fact that articles published in Cleveland, Cincinnati, Lorain, and Elyria newspapers made broad reference to Andrew Roen and the Cheryl Jones statement is not sufficient to apprise the defense of the existence of the evidence suppressed. The mere publication of the articles and their general availability to the public did not provide the defendant with notice that the government possessed exculpatory evidence. Indeed, the references in the articles to Roen as a suspect and the Cheryl Jones statement are phrased in vague, uninformative terms. Nor does this Court believe that the prosecutor's testimony as to his "open-file" policy requires the conclusion that the defense was made aware of this evidence. The prosecutor remembered having only one or two meetings with defense counsel, and did not remember telling him about the evidence raised here. Finally, the most persuasive indication that the defense did not possess this evidence is the fact that the defense never used this evidence at trial. The theme of the defense's closing argument was that the prosecutor "swept under the rug" all evidence that did not connect Stifel with the bombing. Certainly, the presentation to the jury of the evidence now revealed here would have made the "swept-under-the-rug" argument all the more convincing.

This Court is not convinced by the government's argument that the defense avoided using this evidence as a matter of strategy. The government contends that the Andrew Roen evidence was not used by the defense because the government would have effectively rebutted it. As noted by

the defendant, the fact that the government made no attempt to prepare rebuttal witnesses indicates that the government was certain that no such witnesses would be necessary. Moreover, the rebuttal evidence presented by the government at the hearing before this Court is far from conclusive as to Andrew Roen's innocence or Stifel's guilt.

First, the revival of the question of the bomb's addresses in itself creates a doubt as to defendant's guilt. The theory upon which defendant's guilt is premised only makes sense if the bomb was addressed to the victim, Daniel Ronec. At trial, except for Harding's admission that he initially stated the bomb was addressed to *Tom Hronec*, all evidence indicated the bomb was meant for Dan Ronec. The evidence produced at the hearing, however, raises new doubts as to the bomb's addressee, and, hence, the bomb's sender. Now, in addition to Harding's contradictory statements, there is evidence that there was animosity between Andrew Roen and his ex-wife, his former brother-in-law, and his older son, Tom; that Roen had sent threatening mail to the first of these two in the past; and that Roen did not know that Tom had moved away from the family home in Lorain. From this evidence, the jury could reasonably conclude either that Harding's *original statement* that the bomb was addressed to Tom was *accurate*, or that Harding was wrong all together, and that the bomb was addressed to Susan Hronec or Steve Breznen.

Similarly, the government's evidence does not sufficiently refute the inferences that Roen had access to the necessary explosives or that he mailed the bomb from the Canal Zone. All the government has shown, as far as Roen's access to explosives, is that it might have been difficult for him to have taken them, and that no one discovered that he did so. Likewise, in order to accept the government's contention that Roen could not have mailed the package from the Canal Zone, one must believe not only that the Canal Zone postal system was error free, but also that Harding's memory, already shown to be less than infallible, was accurate as to all mark-

ings on the bomb package. While the Andrew Roen evidence does not conclusively establish that Roen did obtain C–3 or C–4 explosives from the ship, it does establish the availability of such explosives to him, an availability which has not similarly been explained in Stifel's case.

In a similar vein, the testimony of one of Roen's superiors that Roen had a noticeable tremor in his hands, and that his job did not involve any highly-technical functions, does not irrefutably establish that Roen could not have made the bomb. At best, this evidence of Roen's lack of ability is on par with the inference that because Stifel knew about fireworks, he had the technical ability to create a bomb.

Thus, although the government creates issues as to the validity of the circumstances implicating Andrew Roen's guilt, it has not shown any evidence that would conclusively establish that Roen was not the sender of the bomb. The identity of the bomb sender was a question for the jury, and defendant should have been apprised of evidence showing that someone other than himself had equal motive, access to materials, and other surrounding circumstances implicating him as the guilty party. The burden on the defendant for purposes of this case is only to show that the prosecution's suppressed evidence could have created a reasonable doubt. In terms of the Andrew Roen evidence, defendant need not prove that Roen committed the crime, but only that the evidence against Roen raised a reasonable doubt as to Stifel's guilt.

This Court believes that the defendant has succeeded in sustaining that burden. The government's case was highly circumstantial, thereby increasing the significance of a circumstantial case against another suspect. In this respect, the prosecutor's statements during closing argument and the trial judge's subsequent *Allen* charge are persuasive indicators that the jury found Stifel guilty because there was no indication that anyone else had the motive and opportunity to commit the crime. The conclusion that defendant sustained his burden of proof is further but-

tressed by the volume of exculpatory evidence which the prosecution possessed. While the Cheryl Jones statement or the results of the Switchcraft investigation [15] taken individually might not create a reasonable doubt as to defendant's guilt, their tendency to negate the evidence against defendant when considered with the significant evidence implicating another suspect as perpetrator, creates a reasonable doubt that did not otherwise exist.

■ The government contends that none of the evidence cited here is "obviously exculpatory." This Court does not agree. The retrospective test for determining whether evidence is obviously exculpatory is whether that evidence creates a reasonable doubt that did not otherwise exist. *Agurs,* 427 at 108, 112–113, 96 S.Ct. at 2401–2402.[16] When, as in the instant case, the prosecution possesses a mass of evidence tending to show that defendant was not the perpetrator of the crime, and when the evidence implicating the defendant is almost entirely circumstantial, the prosecution is sufficiently apprised of its duty to divulge the exculpatory evidence to the defense.

**15.** The holding in this case does not mean that the prosecution is automatically required to disclose to the defense the results of all police investigatory work, or information that is preliminary, challenged, or speculative. *See, e.g., United States v. Peltier,* 553 F.Supp. 890, 899 (D.N.D.1983). Thus, in the ordinary case, the failure to disclose the Switchcraft investigation alone would not result in the violation of defendant's Fifth Amendment rights. Here, however, the Switchcraft investigation results, taken cumulatively with the other suppressed evidence, and considering the circumstantial nature of the case against the defendant, creates a reasonable doubt as to defendant's guilt, and thus results in a constitutional violation.

**16.** In *United States v. Agurs,* 427 U.S. at 107–108, 96 S.Ct. at 2399–2400, the Court explained:

The problem arises in two principal contexts. First, in advance of trial, and perhaps during the course of a trial as well, the prosecutor must decide what, if anything, he should voluntarily submit to defense counsel.

Second, after trial a judge may be required to decide whether a nondisclosure deprived the defendant of his right to due process. *Logically the same standard must apply at both times. For unless the omission deprived the defendant of a fair trial, there was no constitu-*

■ Had the evidence incriminating the defendant been stronger and more conclusive, the prosecution's failure to divulge the evidence raised here would not have attained the stature of a constitutional violation because it would not have created a reasonable doubt that did not otherwise exist. The prosecution's case against Stifel, however, was tentative in that it was largely based upon circumstantial evidence. As noted by the Supreme Court in *United States v. Agurs, supra,* when the jury's verdict is already of questionable validity, evidence of relatively minor importance might be sufficient to create a reasonable doubt. *Id.* at 112–113, 96 S.Ct. at 2401–2402. Here, the suppressed evidence was highly significant when considered in light of the tentative, circumstantial nature of the evidence against the defendant.

■ As to the James Scott testimony, however, this Court finds that the testimony given at trial was not perjury because it was not false or materially misleading. Specifically, this Court finds that the answers given by Scott were responsive to the questions asked [17] and that Scott be-

*tional violation requiring that the verdict be set aside; and absent a constitutional violation there was no breach of the prosecutor's constitutional duty to disclose.*
(Emphasis added.)
The constitutional violation arises when the omitted evidence creates a reasonable doubt that did not otherwise exist. *Id.* at 112, 96 S.Ct. at 2401.

**17.** For instance, the defense never asked Scott whether he did other tests in connection with the bombing. The defense did ask "how many different types of tape [Scott] used in this test," to which Scott replied "In this particular examination you mean," to which the defense replied "Yes." At this point, Scott's answer "Just the two tapes" was accurate. In that particular test—comparing the bomb scene tape with the P & G sample—Scott had only used two tapes. Likewise, the defense's question "If you had received a roll of tape from another place ... and it was from the same batch ... would you have achieved the same results" seems to be asking whether, if Scott had gotten tape from the *same batch* as the P & G and bomb scene tape, he would have achieved the same results. Scott's answer that he "did not know" was an accurate response to that question. The extra

lieved to a reasonable scientific certainty that the bomb scene and P & G tapes were from the same batch.

This Court finds, however, that the James Scott evidence, when considered cumulatively with the Andrew Roen evidence, the Cheryl Jones statement, and the results of the Switchcraft investigation, further supports the conclusion that defendant has shown by a preponderance of the evidence that the evidence suppressed creates a reasonable doubt that did not otherwise exist. That is, had the defense known of the November 1968 tests performed by Scott on tape obtained from Plymouth Rubber Company, it could have used this evidence to further impeach the credibility of Scott's scientific methods.

Decision in this case has not been an easy matter, especially in light of the number of years passed since the original conviction. But the principle of fair trial so fundamental to our system of justice requires that the conviction in this case be vacated:

> The principle of Mooney v. Holohan [that a conviction must be reversed when non-disclosures by a prosecutor violate due process] is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. *Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.* An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts."

*Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). (Emphasis added.)

## VII. *Conclusion.*

Accordingly, this Court has found that the failure of the prosecution to divulge to the defense material, exculpatory evidence in its possession deprived defendant of a fair trial in violation of the Fifth Amendment, and requires vacation of defendant's conviction. Therefore, defendant's motion to vacate sentence pursuant to 28 U.S.C. § 2255 is hereby granted. The judgment of conviction is hereby vacated and set aside, and defendant is hereby granted a new trial.

IT IS SO ORDERED.

---

samples he received from P & G several months later were not—and could not have been—from the same batch as the bomb scene or P & G tapes.