**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Orville E. STIFEL, II, Defendant-
Appellant.**

**No. 19958.**

United States Court of Appeals,
Sixth Circuit.

Oct. 29, 1970.

William F. Hopkins, Cincinnati, Ohio, for appellant.

Harry E. Pickering, Cleveland, Ohio, for appellee; Robert B. Krupansky, U. S. Atty., Harry E. Pickering, Asst. U. S. Atty., Cleveland, Ohio, on brief.

Before PHILLIPS, Chief Judge, EDWARDS and McCREE, Circuit Judges.

EDWARDS, Circuit Judge.

This is a strange and disturbing case. Appellant Orville Stifel, was indicted for violating 18 U.S.C. § 1716 (1964), by murdering another young man, Dan Ronec, by sending him a bomb (an "infernal machine") through the United States mails. The bomb exploded when Ronec opened the package containing it. Stifel had previously been known in the community in which he lived as something approaching a model young man.

Stifel was convicted after jury trial before the United States District Court for the Northern District of Ohio, Eastern Division. He appeals from his conviction and life sentence, raising at least two important issues. First, denying his guilt at trial and on appeal, Stifel contends that the largely circumstantial proofs were inadequate to support a jury verdict of guilt beyond a reasonable

doubt and that the District Judge erred by denying his motion for acquittal. Second, he contends that reversible error was committed by the trial judge in the admission over objection of the expert testimony of a government witness concerning the results of attempts to identify the source of certain bomb package fragments by a process known as neutron activation analysis.

## I THE PROOFS

The victim, Daniel Ronec, then a recent graduate school student at Ohio State University, was killed July 8, 1968, at his parents' home in Lorain, Ohio, by an explosion which tore open his abdomen and tore off his arms. A postman had just delivered a package addressed to him consisting of a mailing tube with a screw-on top. The evidence supports the inference that the bomb went off when Ronec unscrewed the top of the package.

Prosecution evidence bore primarily upon Stifel's possible motive for sending the bomb, upon his capability in relation to fashioning it, and upon the availability to him of materials from which government evidence sought to establish that the bomb and bomb package were made.

As to motive, the government presented evidence concerning appellant Stifel's relationship with a young lady named Cheryl Jones, a student at Ohio State University, to whom Ronec was engaged to be married as of the time of his death. This record leaves no doubt that Stifel and Miss Jones had previously during 1965 and 1966 had a somewhat tempestuous romance which she had sought to terminate in the fall of 1966.

Subsequently, Stifel wrote Miss Jones two letters which contained language which the jury could have regarded as threats.

The first letter read:

"Dear Sher:

I called tonight. You sounded very cheer and gayful. Moreover you handled me very (quite) efficiently—like a boy you met for the first time this afternoon in the malt shop—not like someone who just gave you the most valuable thing he had. It was like some novice to whom you had to make known in no uncertain terms that no punk calls SHERRY JONES and gets a date like that. I mean who do you think you are high school Harry? I date grad studs.

I had lots to communicate but it can wait forever. I tore up the letter I wrote to you last night.

So now let me make something known to you in NO uncertain terms; and I say this not in rage or anger, but in the cold, clear precise manner which you know characterizes my firmest decisions:

I ACCEPT YOUR CHALLENGE YOU LITTLE BITCH. LET'S SEE WHO WINS!

love always,

Orville

P.S. Keep your letter"

The second letter, which Stifel admitted he delivered by hand to Miss Jones, read in part:

"What a mover with the 'in' crowd you can be? Well I'll show you how little, insignificant, and unsecure you are compared to what you could have been had we worked together. This is a petty thing indeed for me to do. I should wipe you off the slate completely, but I would never know whether or not I wiped it off because it was petty or because I was a coward to undertake the petty.

If hate were written on every grain of sand in the saraha [sic] it would not express the feeling you will have for me when I'm through with you.

Now that you have promoted yourself to the ranks of 'mover' let's see who can move the better—you or me? ? ?

?''

Miss Jones also testified to a telephone conversation shortly after Stifel had learned that she was going with Ronec:

"A  *  *  *  That evening I received a phone call from him. He said he was sick and he was on—he had been on his way to Columbus with a gun to shoot me and whoever I was with. However, en route the authorities had picked him up. The reason they picked him up is somehow he had left a note behind and one of his roommates found the note. It may have indicated what he was doing, I don't know.

"Q  You are telling us what he told you now?

"A  Yes, exactly what he told me."

Miss Jones said that she didn't believe what Stifel had told her. Stifel denied that this conversation ever took place.

Appellant's counsel reminds us that all of these expressions took place 18 months before the bombing and suggests that they could not be reasonably related thereto. There were, however, some intervening events.

In December 1967 Miss Jones became engaged to Ronec and their wedding date was set for August 1968 (a date just a few weeks after Ronec was killed). Stifel learned both of these facts from Miss Jones, but there is no indication that he ever learned that actually the wedding date was thereafter postponed to the subsequent January.

Lawrence Meehan, a friend of Stifel's at Ohio University at Athens, who, like Stifel, had returned to Cincinnati, testified that in late May or early June 1968 Stifel asked him to accompany him on a trip to Columbus. Stifel told him he wanted to use the library at Ohio State University. Meehan agreed and Stifel drove him to Columbus. Shortly after arriving there, Stifel wrote a note, sealed it in an envelope, and asked Meehan to hand deliver it to Daniel Ronec at 982 Highland Street in Columbus. Stifel drove Meehan to the Highland address,

but did not wait for him. When Meehan found the apartment unoccupied, he subsequently met Stifel at a designated restaurant. Meehan gave Stifel the envelope and Stifel put it on the dashboard of his car—never thereafter mailing it.

Other testimony indicated that Daniel Ronec was listed in the Ohio State University directory at two addresses—the one on Highland, where Meehan attempted to deliver the letter, and the other at 224 W. 32nd, Lorain, Ohio, where Ronec was killed.

Stifel's testimony when cross-examined about this bizarre episode was apparently unconvincing to the jury—and in cold type it is no more convincing to us.

"Q  *  *  *  Now, you found out that he lived on Highland Avenue, is that correct?

"A  I don't recall what the address was now any more, but subsequent testimony would leave me to believe, yes, it was on Highland Avenue—that is, testimony brought before this Court.

"Q  And you and Mr. Meehan looked for that particular address on that particular street?

"A  I drove him—we drove to a gas station which was diagonally across the intersection from the Burger Boy Fooderama, and asked where Highland Avenue was. The guy told me that it ran—someone there, I don't know whether the guy worked or not—told me that it ran parallel to High Street for so many blocks.

"I found Highland Avenue, and I dropped Larry off. I said, 'Here, see if you can find out where this is and if the person still lives there, ask a neighbor, something like that. If he does, drop it in the mailbox. If he doesn't, you know, bring it on back straight. Please get back to the car as soon as you can, because I'm going to leave Tarsha—that is my dog, my German shepherd—will be in the

car. He's hot. I don't want to roll the window up all the way, you know, she will suffocate in the car. Please get back there as quickly as possible.'

"Q Why didn't you take the letter and deliver it in person?

"A Because—the purpose of my going through all of this routine was to give him an errand to do, so that he would take care of the car and watch the dog for me while I was in the library, to give him something to do, that he would watch my car. I had to keep the thing unlocked because I wanted the window rolled down so my dog could breathe. When I went to the library, he could be in the automobile with the dog, or walk the dog around the car, so that the car wouldn't be towed away. There are signs in this parking lot that say, 'Patrons. Any cars not belonging to patrons, or automobiles, will be towed,' so on and so forth.

"Q That letter was addressed to Daniel Ronec, wasn't it?

"A Yes, sir.

"Q You had a stamp on that letter, did you not?

"A That is correct, sir.

"Q Did you ever drop that letter in the mailbox afterwards?

"A No, sir.

"Q So far as you are concerned, the last you know where the letter was was on the dashboard of your car?

"A That is the last I could say where it was for certain."

A good deal of the government's testimony pertained to evidence establishing appellant's experience in handling firearms, fireworks and small rockets. While none of this activity (which appellant conceded) directly involved detonating explosives, the government argued that this background, plus the availability of Stifel's father's tools and machinery, was evidence from which the jury could have inferred that Stifel had the capability required to manufacture the bomb.

The government also produced witnesses to establish that certain materials from which the bomb package could have been fabricated were available to him at his place of employment in a Cincinnati laboratory of Proctor & Gamble.

Proctor & Gamble employees testified that screw top mailing cylinders similar in size to that described by the postman who delivered the bomb were available in a stock room to which appellant had access, along with mailing stickers and tape which were similar likewise to the sticker and the tape employed on the bomb package.

The government also introduced expert testimony pertaining to microscopic examination of pieces of material recovered from the bomb site and comparison of them through microscopic examination with materials available at Proctor & Gamble. This expert testimony indicated that the bomb package cylinder, its metal top, its mailing sticker and its tape were microscopically similar to cylinders, tops, mailing stickers and tape which were in the Proctor & Gamble stock room to which appellant had access.

The Government also produced an expert witness from the Identification Laboratory of the Postal Inspection Service in Washington, one James Scott, who testified pertaining to his study of various fragments of the bomb package by the method of neutron activation analysis. By this means Scott sought to establish whether the pieces of cardboard, vinyl tape, metal top, and paper gummed label were or could have been from the same manufacturer and same batches as similar items found in the Proctor & Gamble inventory.

The thrust of his testimony was that the particles from the bomb could accurately be so identified. Although the admissibility of this evidence is, of course, hotly disputed, for purposes of determining the adequacy of evidence to present a jury question, it is appropriate to record it here.

Still another expert witness described his examinations of bomb fragments which he determined to be portions of the switch which Ronec closed when he unscrewed the mailing cylinder's metal top. He also identified it as a particular switch (Switch Craft #10002) which was advertised in a catalogue of a mail order electrical supply house which was found in appellant's apartment when it was searched under warrant.

During that same search, in the bottom of appellant's clothes closet seven out-of-town newspapers were found, each of which contained material dealing with the Ronec bombing. No other out-of-town newspapers were found.

During this same search of appellant's living quarters a jar of copper pennies was discovered. One of the government's experts in microscopic examination of bomb debris had identified mutilated copper pennies as having been "in very close proximity of the blast."

This summary of the facts has, of course, taken into account the rule that we review the evidence supporting jury verdicts of guilty from the point of view most favorable to the government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

Much of the evidence referred to is circumstantial in nature, but this fact alone does not require reversal. This court has recently said:

> "The fact that the evidence is largely circumstantial is inconsequential. Circumstantial evidence, if strong enough to convince a jury of a defendant's guilt beyond a reasonable doubt, is sufficient to take a case to the jury and sustain a verdict. United States v. Conti, [339 F.2d 10], *supra;* United States v. Burkeen (United States v. Matlock, United States v. Matlock), 350 F.2d 261 (6th Cir. 1965), cert. denied, Matlock v. United States, 382 U.S. 966, 86 S.Ct. 457, 15 L.Ed.2d 369; United States v. Comer, 288 F.2d 174, 175 (6th Cir. 1961), cert. denied, 366 U.S. 925, 81 S.Ct. 1351, 6 L.Ed.2d 384; United States v. Baxter, 289 F.2d 487 (6th Cir. 1961), cert. denied,

368 U.S. 827, 82 S.Ct. 48, 7 L.Ed.2d 31." United States v. May, 430 F.2d 715 (6th Cir. 1970). (Decided September 2, 1970).

We conclude that the evidence set forth above, if believed by the jury, (as obviously was true in this case) was sufficient to convince reasonable minds beyond a reasonable doubt of appellant's guilt. United States v. Conti, 339 F.2d 10 (6th Cir. 1964). Under these circumstances, we find no error in the District Judge's denial of appellant's motion for acquittal.

## II NEUTRON ACTIVATION ANALYSIS

█ The second important issue presented by this appeal is appellant's claim that the District Judge committed reversible error by admitting over vigorous objection the expert testimony concerning neutron activation analysis of bomb package fragments to which we have just referred. Since we think this evidence may have had sufficient impact in this largely circumstantial evidence case to have affected the jury verdict, we cannot treat its admission as harmless error. This issue is of added importance because the challenged process is relatively new and there is little legal precedent available as to its admissibility.

The government's witness concerning neutron activation analysis was James Scott, a chemist and microanalyst attached to the Identification Bureau of the Post Office Department Inspection Service in Washington, D. C. Scott testified as to his training in neutron activation analysis and as to his writings in the field. His expert witness credentials were accepted by the District Judge and no issue concerning them is presented on appeal.

Scott testified concerning his examinations of four exhibits of bomb debris: 1) portions of a Dennison mailing label, 2) portions of the cardboard mailing tube, 3) portions of the metal cap and rim from the mailing tube, and 4) a piece of red plastic tape found adhering to the top of the Switch Craft switch recovered at the scene. His analysis com-

pared each of these items to similar mailing labels, mailing tubes and caps and vinyl tape found in the Proctor & Gamble storeroom. All of these items had been found by another government expert witness to be microscopically "identical" or "indistinguishable" from their counterpart exhibits found at Proctor & Gamble.

Employing neutron activation analysis, Scott testified that in his opinion the mailing label and the cardboard tube fragments were of the same "elemental composition" as their Proctor & Gamble counterparts and that "within reasonable scientific certainty" they were "of the same type and same manufacture."

As to the metal cap and vinyl tape fragments, Scott's opinion was that these were "of the same manufacture" and from "the same batch" as the Proctor & Gamble exhibits. Scott defined "batch" as being the general equivalent of one day's manufacturing production. In relation to the trace elements in the metal top, Scott testified that he ran another test known as an "atomic absorption test" which helped him reach his conclusion.

In this appeal no attack is made on the trial judge's admission of the results of microscopic examination or the atomic absorption tests. But appellant contends vigorously that the neutron activation analysis test results and Scott's opinion testimony derived therefrom were inadmissible because the test is too new and unreliable and has not yet been generally accepted by scientists in its particular field. Frye v. United States, 54 App.D. C. 46, 293 F. 1013 (1923); Annot., 34 A.L.R. 147 (1925).

Both Scott and appellant's three expert witnesses testified extensively about the neutron activation analysis process. But we feel that the following description is the most understandable and succinct explanation which we have found available.

American Jurisprudence's "Proof of Facts" describes the process thus:

"One of the newest and most promising techniques of forensic science is neutron activation analysis. The ability of this nuclear method to detect traces of elements in minute samples enables it to solve many problems of identification that have heretofore been considered hopeless. As shown in Figure 1, the process is essentially one whereby the material to be analyzed is first made radioactive—i.e., it is 'charged' so that it will give off or emit radiation in the form of gamma rays. This radioactive sample is then exposed to a scintillation crystal; and every time a gamma ray from the radioactive material interacts with the crystal, it emits a flash of light, which is converted into an electrical pulse whose voltage is proportional to the energy of the gamma rays. An electronic device called a multichannel differential analyzer then sorts the electrical impulses into different energy groups and adds up the pulses in each group. The result is a graph shown on an oscilloscope screen. The graph contains information related to the kind and amount of elements in the radioactive sample and can be transcribed immediately or stored on magnetic tape or punches paper tapes for future reference.

"Virtually no sample of material is too small to be analyzed by activation analysis. A single hair, a shred of marijuana, or a fleck of automobile paint no longer than the period at the end of this sentence can be analyzed and correctly identified. Furthermore, activation analysis's high sensitivity allows quantitative measurement of elements in the parts per million and parts per billion range. For instance, if one thimbleful of arsenic poison were diluted in ten tankcars of water, the exact amount of arsenic present could be determined by activation analysis. In most cases the analysis is also nondestructive, so that material evidence may be preserved for presentation in court or saved for analysis by another method." Watkins and Watkins, Identification of Substances by Neutron Activation Analysis, 15 Am. Jur. "Proof of Facts" 115, 116–19 (1964).

**Figure 1. Illustration of How Activation Analysis Works.** After being bombarded with neutrons, various elements in a sample material become radioactive, and by analyzing the energy of the emitted gamma rays, the different elements in the material can be identified and measured. (Reprinted from *Neutron Activation Analysis*, courtesy U. S. Atomic Energy Commission.)"

[A2875]

In determining admissibility of evidence based on this disputed process, we start with the proposition that appellate courts recognize a considerable area of discretion on the part of the trial judge in admitting or refusing to admit prof-

fered expert testimony. Spring Co. v. Edgar, 99 U.S. 645, 25 L.Ed. 487 (1878); Fineberg v. United States, 393 F.2d 417 (9th Cir. 1968); Rhodes v. United States, 282 F.2d 59 (4th Cir.), cert. denied, 364 U.S. 912, 81 S.Ct. 275, 5 L. Ed.2d 226 (1960). In the earliest of these cases, the United States Supreme Court said:

> "On questions of science, skill, or trade, or others of like kind, says Greenleaf, persons of skill, sometimes called experts, may not only testify to facts, but are permitted to give their opinions in evidence. 1 Greenl. Evid., sect. 400; Buster v. Newkirk, 20 Johns. (N.Y.) 75.

> "Whether a witness is shown to be qualified or not as an expert is a preliminary question to be determined in the first place by the court; and the rule is, that if the court admits the testimony, then it is for the jury to decide whether any, and if any what, weight is to be given to the testimony. Cases arise where it is very much a matter of discretion with the court whether to receive or exclude the evidence; but the appellate court will not reverse in such a case, unless the ruling is manifestly erroneous. D. & C. Steam Towboat Co. v. Starrs, 69 Pa. St. 36; Page v. Parker, 40 N.H. 48; Tucker v. Massachusetts Central Railroad, 118 Mass. 546." Spring Co. v. Edgar, supra at 657–658, 25 L.Ed. 487.

In Frye v. United States, supra, the Court of Appeals for the District of Columbia dealt with admissibility of a scientific test in these much quoted terms:

> "Numerous cases are cited in support of this rule. Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye v. United States, supra, 293 F. at 1014.

Employing this standard in this case, we do not believe that the District Judge's admission of Scott's evidence can appropriately be held to be reversible error. The decision as to whether the state of the technology in this field was such as to render testimony based on neutron activation analysis admissible was, of course, a decision for the Judge. Any disputes about the technique employed by the government's expert or the results of his test went to the quality of the evidence and were for consideration by the jury.

Appellant presented three well-qualified experts who attacked Scott's test procedures as inadequate. Two of these witnesses also argued generally that neutron activation analysis was too new and untried to provide conclusive proof of identity of such tested materials and was "inconclusive evidence for court use."

Appellant's witnesses' criticisms of Scott's test methods were fully developed before the jury and were appropriate for that body's consideration. Such rebuttal evidence went to the weight of Scott's testimony—not to its admissibility.

Further, neither newness nor lack of absolute certainty in a test suffices to render it inadmissible in court. Every useful new development must have its first day in court. And court records are full of the conflicting opinions of doctors, engineers and accountants, to name just a few of the legions of expert witnesses.

Testimony based on neutron activation analysis has not been rejected by any appellate court in any case cited to us or which our research has found because neutron activation analysis was "too new," "too unreliable," or lacking in "general acceptance" in its own scientific field.

Two cases cited by appellant are readily distinguishable from the instant case. In United States v. Kelly, 420 F.2d 26 (2d Cir. 1969), the Second Circuit reversed a criminal conviction because evidence based on neutron activation analysis was admitted on behalf of the prosecution where the defendant was given no prior notice of the government's intention to employ such evidence, and no opportunity to make similar tests or to seek to present counter expert opinion. In *Kelly,* however, the court remanded for new trial to give "a fair opportunity for the defense to run its own neutron activation tests of the material * * *." No such problem confronts us here. While appellant's expert witnesses in this case did not see fit themselves to make any test of the bomb debris, no claim of lack of ample opportunity to do so is suggested by this record.

In State v. Holt, 17 Ohio St.2d 81, 246 N.E.2d 365 (1969), an expert witness whom the prosecution called to testify as to his opinion following neutron activation analysis tests of hair from the victim and some hair found on the defendant gave as his opinion that " 'the samples are similar *and are likely* to be from the same source.' " (Emphasis in original). The Ohio Supreme Court held the underlined words to characterize an opinion less than "reasonable scientific certainty" and found its admission to have been reversible error. Although the Ohio Court characterized neutron activation analysis as "a relatively new procedure and * * * still in its infancy," the holding in the case was not based on rejection of neutron activation analysis as a test.

The first reported appellate decision squarely upholding admissibility of evidence of neutron activation analysis testing is State v. Coolidge, 260 A.2d 547 (N.H.1969). The New Hampshire Supreme Court dealt with many of the same problems with which we deal in this case:

"The testimony upon this score disclosed that some forty samples of particles were visually selected for analysis, based upon similarity of appearance under a microscope. Of the particles so selected and subjected to nuclear testing, four sets, (each consisting of particles obtained from the victim on the one hand and from the accused on the other), were found to have various chemical elements in common and in such comparable abundance as to warrant testimony by the expert that the particles in each set had a common origin or source, although each set differed in composition from the other.

"In support of his exception to receipt of this evidence, the defendant argues first, that neutron activation analysis was not shown to have gained general acceptance in the scientific profession, at least for purposes of matching 'unknown particles,' secondly, that the 'technique actually used' did not follow the technique generally accepted by the profession, and finally, that the evidence of similarity was insufficient to support the witness' conclusion of common origin, or to permit a like inference by the jury.

* * * * * *

"The Court could properly find that the tests of particles produced an accurate analysis of the chemical elements which they contained, by means of procedures sufficiently accepted by scientists familiar with this limited field. See State v. Roberts, 102 N.H. 414, 158 A.2d 458; State v. Reenstierna, 101 N.H. 286, 140 A.2d 572.

"The fact that the defendant's expert testified that he would have subjected the particles to longer periods of radiation, and required a more absolute qualitative testing, went to the weight of the evidence received rather than its admissibility. State v. LaFountain, 108 N.H. 219, 221, 231 A.2d 635, *supra.*

"The probative significance of the results of the analysis was a matter for expert opinion. The State's witness Hoffman had conducted extensive tests upon 'unknown' paint samples, and participated in other testing programs. He was of the opinion, as to four dif-

ferent sets of matching substances each of which was found to have common elements in comparable relative abundance, that each set came from a common source, or origin, although found in different places. The defendant's expert entertained a contrary view of the significance of the findings. The issue so presented was one which was properly submitted to the jury for decision. State v. Thorp, 86 N.H. 501, 507, 171 A. 633, 172 A. 879. Essentially, as in the case of Dr. Harrison's matching tests, the issue involved the 'mathematical theory of probabilities.' See Wigmore, Evidence, (3d ed.) s. 414 p. 389; People v. Collins, 68 Cal.2d 319, 66 Cal.Rptr. 497, 500, 438 P.2d 33, *supra;* State v. Sneed, 76 N.M. 349, 414 P.2d 858, *supra.* We cannot hold that the testimony of either Hoffman or Harrison was irrelevant or incompetent as a matter of law." State v. Coolidge, *supra* at 560–561.

The careful article concerning neutron activation analysis by R. M. and J. C. Watkins from which we have already quoted has now been supplemented in the 1969 Supplement to American Jurisprudence, "Proof of Facts." Among other developments, this comment cites nine cases wherein neutron activation analysis evidence was involved, and adds a comment as to how this technology is being developed.

"NEUTRON ACTIVATION ANALYSIS

| | Place Tried | Evidence | Date Found Guilty |
|---|---|---|---|
| U.S. v W. Anderson | Federal Court, New York | Soil | March 16, 1964 |
| | Federal Court, Southern District, Ohio | Auto Body Putties, Adhesive Tape | May 20, 1964 |
| Calif. v W. R. Woodard | Superior Court, San Mateo, California | Paint | July 3, 1964 |
| U.S. v J. Nunn R. Reed & H. Scurry | Federal Court, Columbia, South Carolina | Paint & Charcoal | September 22, 1964 |
| U.S. v Kneece, Jr. W. Kneece, J. Craps & J. Johnson | Federal Court, Aiken, South Carolina | Paints | March 25, 1965 |
| Virginia v W. Allen & E. Woods | | Grain | November 24, 1965 |
| U.S. v A. Jackson et al | Federal Court, Miami, Florida | Moonshine | February 1, 1966 |
| Calif. v Herrera | County Court, Oakland, California | Soil | February 11, 1966 |
| Massachusetts v Lisacki | Superior Court, Middlesex, Mass. | Human Hairs | April 8, 1966 |

Figure 1. Recent Cases Involving Neutron Activation Analysis

[A2876]

Through support for the U. S. Atomic Energy Commission, reearch and development are continuing both at the Treasury Department and at General Atomic. These groups have cooperated closely on a number of projects and have carried out most of the work described below. Mr. Maynard Pro is the head of the Treasury Department group, while research at General Atomic is directed by

Dr. Vincent Guinn. Only recently the Office of Law Enforcement Assistance of the U. S. Department of Justice has added its support to the General Atomic research program, so that work on applying NAA to criminalistics now is being carried on at triple the previous rate." Watkins and Watkins, Identification of Substances By Neutron Activation Analysis, 15 Am.Jur. "Proof of Facts" 12 (Supp.1969).

Although it is obvious to any reader that the Watkinses are neutron activation analysis advocates, it is hard to read their two articles without concluding that neutron activation analysis offers a genuine advance in scientific identification of materials which the courts should not ignore.

Of some weight also is a Technical Note from the National Bureau of Standards' bibliography of over 100 scientific papers dealing with neutron activation analysis. National Bureau of Standards, Dep't of Commerce, Tech. Note 519, Forensic Science: A Bibliography of Activation Analysis Papers (1970).

In this case we have the testimony of four expert witnesses who testified concerning neutron activation analysis.[1] Each (including the three expert witnesses called by the defense) was by his own testimony devoting much of his life to development of this method of testing and comparing materials.[2] There was testimony concerning neutron activation analysis' value in many varied applications in civil and commercial affairs. While two of appellant's witnesses (as we noted above) specifically stated their objections to use of neutron activation analysis in court because of their opinion

that its results were not sufficiently "conclusive," as we have previously shown, "conclusiveness" is not the requirement for admissibility of scientific evidence. The record in this case affords support for the proposition that neutron activation analysis has gained "general acceptance in the particular field in which it belongs." Frye v. United States, 54 App.D.C. 46, 293 F. 1013, 1014 (1923).

On this record and on the authorities cited to and found by us, we discover no basis for holding that test results based on neutron activation analysis are inadmissible as a matter of law or that the District Judge abused his discretion in admitting the expert witness testimony of Mr. Scott.

While we believe that the neutron activation analysis evidence meets the test of admissibility in this case, we also note that like any other scientific evidence, this method can be subjected to abuse. In particular, if the government sees fit to use this time consuming, expensive means of fact-finding, it must both allow time for a defendant to make similar tests, and in the instance of an indigent defendant, a means to provide for payment for same. We do not enumerate these problems because we think they are the only ones which may develop, but simply because they are the examples which come first to mind.

### III OTHER ISSUES

Appellant also claims that pictures of the corpse of the deceased which were admitted in evidence represented erroneous admission of inflammatory material. The government responds to this

---

1. One of appellant's expert witnesses, Lamont Bate, a chemist employed by the Union Carbide Co. at the Oak Ridge National Laboratory, testified:

    "Q Neutron activation analysis, Mr. Bate, is considered a scientifically valid method of analysis, isn't it?
    "A Yes, it is. It is a recognized method."

2. Dr. Enzo Ricci, another of appellant's expert witnesses, who is a radio chemist

employed by Oak Ridge National Laboratory, testified:

"In 1962, I continued working on activation analysis at Oak Ridge National Laboratory, and I was concerned with a number of developments that we took care of.

"My main job there is to develop new methods of activation analysis and evaluate the older methods to find out pitfalls and mistakes that can be made."

last issue by asserting that the pictures were relevant because they lent weight to the government's contention that Ronec was killed as he was unscrewing the cap to the mailing tube and that the pictures demonstrate the force of the explosion and, hence, the lethal intent of the sender. While defendant's evidence did not dispute either of these contentions, the government had the burden of proof and no stipulation on these points was tendered.

The majority of our panel believes that this evidence was relevant for the reasons cited and on balance that their admission represented no abuse of the District Judge's discretion. Rivers v. United States, 270 F.2d 435 (9th Cir. 1959), cert. denied, 362 U.S. 920, 80 S. Ct. 674, 4 L.Ed.2d 740 (1960); Burns v. Beto, 371 F.2d 598 (5th Cir. 1966).

Judge McCree believes that the evidence provided by the pictures was not necessary to the government's case because, in his view, the manner in which Ronec met his death was not disputed, and on balance the prejudicial effect of the pictures outweighed their evidentiary usefulness.

It is, however, the unanimous view of our panel that under no circumstances could the horror of this crime have been kept from the jury and that in consideration of the total record, we cannot appropriately construe admission of these two black and white photographs to be reversible error.

Nor do we find any such error in the District Judge's giving of a version of the *Allen* charge. Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

The District Judge followed closely the last opinion of this court dealing with such a charge. United States v. Harris, 391 F.2d 348 (6th Cir.), cert. denied, 393 U.S. 874, 89 S.Ct. 169, 21 L.Ed.2d

145 (1968). See also Sanders v. United States, 415 F.2d 621 (5th Cir. 1969), cert. denied, 397 U.S. 976, 90 S.Ct. 1096, 25 L.Ed.2d 271 (1970).

The judgment of the District Court is affirmed.