**UNITED STATES of America, Plaintiff,**

v.

**Steven Wayne YEE, et al., Defendants.**

**No. CR 89–720.**

United States District Court,
N.D. Ohio, W.D.

Feb. 14, 1990.

**630**

William M. Kunstler, Ronald L. Kuby, New York City, K. Ronald Bailey, Sr., Sandusky, Ohio, Ralph Buss, Painesville, Ohio, Terry H. Gilbert, Cleveland, Ohio, for defendants.

Michael T. Rae, U.S. Dept. of Justice, Criminal Div., Strike Force, Cleveland, Ohio, Barry C. Scheck, Peter Neufeld, New York City, for plaintiff.

JAMES G. CARR, United States Magistrate.

This is a criminal case in which pretrial matters have been referred to the undersigned for initial hearing and determination. Pending are motions by the defendants for discovery of materials relating to testing for purposes of DNA analysis of blood taken from one of the defendants (John Ray Bonds) for purposes of comparison with blood found in the vehicle of another of the defendants (Steven Wayne Yee) and the van of a murder victim.

The defendants seek specifically designated items that relate, in general terms, to development by the F.B.I. Laboratory of matching criteria and standards (which serve as a benchmark for purposes of assessment of known versus unknown samples), tests conducted with reference to the effect of "environmental insults" on the reliability of the DNA testing process, information about population data, which is the basis on which an opinion can be expressed about the degree of likelihood that a particular sample manifests characteristics that are shared by another person, and results of proficiency testing.

The defendants' requests for discovery of this material were contained in discovery demands (docs. 111, 119, 167, 200A), and have been the subject of extensive pretrial discussion between the parties, and between the parties and the undersigned. In addition, these discovery requests were the subject of oral argument on February 1, 1990.

At that argument, the defendants appeared to accept, without expressly doing so, the government's contention that the materials that they are seeking are not encompassed within Fed.R.Crim.P. 16. Consequently, much of the discussion during that session related to other possible bases for granting discovery, and whether the circumstances of this case were such that a logical and legal basis for granting the requested discovery could be ascertained outside the confines of Rule 16.

At ultimate issue is the admissibility of scientific evidence that heretofore has not been offered in a federal criminal proceeding. A hearing in limine on the admissibility of the DNA evidence in this case has been scheduled for mid-April, and is expected to last for at least two weeks. The defendants have made their discovery requests in order to be prepared to cross-examine the government's witnesses at that hearing and acquaint their own experts in advance of the hearing with the underlying data on which assessments of the DNA evidence in this case are based, so that those experts can present their own opinions about the reliability of that DNA evidence.

■ The basic legal principles governing the admissibility of novel scientific evidence are not at issue. In this Circuit, the conventional *Frye* standard continues-to be applied. Thus, the DNA evidence will be admissible if the government establishes that the scientific processes on which it is based have gained "general acceptance in the particular field in which it belongs." *United States v. Franks,* 511 F.2d 25, 33 n. 12 (6th Cir.1975) (upholding admissibility of "voiceprints"). "General acceptance," the Court stated in *Franks,* is "nearly synonymous with reliability. If a scientific process is reliable, or sufficiently accurate, courts may also deem it 'generally accepted.'" *Id. See also United States v. Distler,* 671 F.2d 954 (6th Cir.1981) ("oil fingerprinting" admissible); *United States v. Brady,* 595 F.2d 359, 362 (6th Cir.1979) (expert evaluation of optical microscopic comparison of hair samples admissible); *United States v. Brown,* 557 F.2d 541, 556 (6th Cir.1977) (hair comparisons by ion microprobic analysis inadmissible); *United States v. Stifel,* 433 F.2d 431, 441 (6th Cir.1970) (neutron activation analysis admissible).

In *Franks, Distler* and *Stifel* the determination of whether the proposed scientific evidence would be admitted was undertaken at a time when a body of scientific assessments of the theories and techniques already existed. *See Distler, supra,* 671 F.2d at 962 (methods "have received a significant degree of national and international recognition"); *Stifel, supra,* 433 F.2d at 441 (reference to 100 scientific papers on neutron activation analysis); *United States v. Baller,* 519 F.2d 463, 465 n. 1 (4th Cir. 1975) (references to materials re. voiceprints). In *Brown,* in contrast, the proposed evidence was held to be inadmissible primarily on the basis that the proponents conceded that their test results had not been duplicated elsewhere and they were unable to cite any authority in the field in support of their positions. 557 F.2d at 557.

A distinctive feature of this case is that there has been no similarly extensive independent scientific assessment and replication of the reliability of the procedures that have been developed by the F.B.I. for determining whether the DNA in an unknown sample matches with the DNA of a known subject. In their battle in this case, therefore, the experts will not be armed with their usual weapons—namely, the research, results, and opinions of others in their field. As a consequence, this Court, as it undertakes to determine whether the government's DNA evidence meets the *Frye/Franks* standard, will be doing so without the kind of guidance from the scientific community that usually is available when newly discovered scientific techniques are offered into evidence. Although, as the Sixth Circuit noted in *Brown, supra,* a "courtroom is not a laboratory," 557 F.2d at 556, the circumstances of this case call on this Court to use the legal process as a surrogate for scientific procedure to ascertain the reliability of the government's evidence.

Another aspect of this case that, though not unique, is important, is the fact that the defendants have developed bona fide questions about each of the categories in which they are seeking discovery. Although at this point those questions are basically expressions of uncertainty, rather than a compilation of contradictory scientific views, their seriousness and potential significance are underscored by past statements of the F.B.I. laboratory relative to desirable standards and procedures that, at least according to the defendants, that laboratory itself has not fully implemented. (Doc. 167, Exh. G (Quality Control in DNA Typing: A Proposed Protocol)).

The usual demands presented by any new scientific evidence are, therefore, intensified by the absence of a substantial body of scientific evaluation, just as the difficulties of the challenges presented in this case are increased by the complex nature of the evidence. The precondition to reaching a correct decision concerning the admissibility of the DNA evidence in this case is, accordingly, a record that is as complete and clear as is reasonably possible. That consideration persuades me that there is merit in the defendants' contention that the real issue raised by their motion is not whether the information that they are

seeking will be produced at some point in the proceedings; the question, rather, is when production shall occur.

The objective of developing the most complete and clear record possible can be accomplished only if the parties are able expeditiously and effectively to present their differing views on the reliability of the proposed evidence. If prehearing discovery does not occur, there is a considerable—indeed, probably inevitable and undeniable—likelihood that the in limine proceedings will be substantially protracted. If the information at issue in the instant motion remains undisclosed until the direct testimony of the government's witnesses, it is likely that recesses will have to be taken to provide time for defense counsel to prepare for cross-examination of those witnesses in light of that information, and, as well, to enable the defense experts to formulate their own opinions. If, through application of the Jencks Act, 18 U.S.C. Sec. 3500, disclosure does not occur until after that testimony, delay will be unavoidable.[1]

Such delays would make the in limine proceedings not only inexpiditious, but ineffective as well. As noted, I expect that the issues in that proceeding will be complex and challenging, especially to one as untutored in basic scientific doctrine and methodology as I. If I am unable to hear all the evidence in as compressed and comprehensive a manner as possible, my ability simply to follow, much less comprehend the flow of scientific opinion will be impaired. Thus, to deny disclosure prior to hearing is to ensure inefficiency, at least from my standpoint.

Of more concern, when assessing the likely impact of the delays that will result if prehearing disclosure is denied, is the consideration noted by defense counsel during the proceedings on February 1, 1990: namely, that the defendants have been detained without bond since their arrests nearly a year ago. That already prolonged period of pretrial confinement should not

be further protracted absent a showing of substantial legal basis and necessity.

■ It is against this background that the defendants' discovery requests should be viewed. Unquestionably, the just-mentioned "exigencies of court administration," *United States v. Algie,* 667 F.2d 569, 571 (6th Cir.1982), do not, standing alone, either justify or permit prehearing disclosure in this case, as the Sixth Circuit's opinion in *Algie* makes clear. On the other hand, that decision should not be given broader scope than is justified by the issue that it considered.

That issue was whether a trial court could, as a matter of standing rule and policy, compel production of Jencks material prior to the time specified in the statute (*i.e.,* after a witness's direct testimony). The Court of Appeals held that such disclosure could not, in light of the clear language and express purpose of the Act, be compelled over the government's objection. But the opinion in *Algie* does not foreclose pretrial production of all material that might fall within the Jencks Act if it is otherwise subject to production under Rule 16.

The issue in this case, therefore, is whether, contrary to the defendants' initial impression, which was shared by me and the government, there is a basis for ordering production within the confines of Rule 16. For the reasons that follow, I conclude that the Rule provides a basis for granting the defendants' motion for discovery of the items that they are seeking.

In their memorandum of February 9, 1990, the defendants assert that Rule 16(a)(1)(C) provides that basis. In pertinent part, that rule provides that the defendants can obtain discovery of books, papers, documents, or other tangible objects that "are material to the preparation of the defendant's defense *or* are intended for use by the government as evidence in chief at the trial" (emphasis supplied). The defendants argue that the information that they are seeking is necessary to enable them to

---

[1] Any materials that are within the Jencks Act would be subject to production at the in limine hearing, which is a component of the trial that

is occurring ahead of time in the interest of judicial economy.

cross-examine the government's DNA witnesses, so that they can challenge and respond to the theoretical underpinnings of the government's standards and processes and the overall reliability of the results obtained upon implementing those theories and procedures in this case. In addition, the defendants seek prehearing discovery in order to prepare their own experts for the hearing. In support of their contentions, the defendants cite *United States v. Liebert,* 519 F.2d 542, 449 (3rd Cir.1975), and two Sixth Circuit decisions, *United States v. Russo,* 480 F.2d 1228 (6th Cir. 1973), and *United States v. Stifel,* 433 F.2d 431 (6th Cir.1970).

In *Liebert* the defendant in a failure to file tax prosecution sought access to information relating to the government's computerized procedures for determining that a taxpayer had failed to file his income tax returns. The government's computer had produced the crucial evidence against the defendant that there was no record that he had complied with the filing requirement. In support of his request, the defendant showed that there was reason to doubt the accuracy of the nonfiler list, and that the list contained, in fact, names of persons who had filed their returns. *Id.* at 545.

The nonfiling list, the court concluded, was clearly material to the defendant's defense. In order for that list to be accepted into evidence, the government was required to lay "a foundation sufficient to warrant a finding that such information is trustworthy and the opposing party is given the same opportunity to inquire into the accuracy of the computer and its input procedures as he has to inquire into the accuracy of written business records." *Id.* at 547. The opposing party's ability to challenge the government's foundation, the court emphasized in *Liebert,* entitles him "to sufficient opportunity to obtain by pretrial discovery whether both the machine and those who supply it with data input and information have performed their tasks accurately." *Id.*

Despite these considerations, the court upheld denial of discovery on the basis that production of the requested materials would adversely affect the privacy rights of the persons whose names appeared on those lists, and that substantial difficulties would be encountered at trial in managing the information developed from the lists. *Id.* at 548–50.

Neither of those considerations is pertinent here. The privacy rights of third parties are unaffected (or, if affected, can be accommodated by redaction of any personal identifying characteristics in any documents that become part of the record). Nor will the granting of discovery increase the difficulties of trying this case. Indeed, the whole purpose of the motion in limine proceeding is to determine prior to the trial whether the DNA evidence is admissible.

Another feature of the *Leibert* opinion is noteworthy. In that case the court notes that the government, both voluntarily and in response to the district court's discovery order, had agreed to make substantial information accessible to the defense. Much of this information appears to be analogous to (if not considerably more far reaching and intrusive than) the information sought in the instant motion. In addition, inter alia, to allowing access to "all handbooks documenting the procedures, machine operations, and other relevant information pertaining to its electronic data processing system," the government agreed to make an available "an expert who has made studies on the reliability of the [I.R.S.] data processing systems." *Id.* at 550. These items appear to correspond to the requests being made here: "handbooks documenting procedures," etc. appear similar to information about the development of matching criteria and population data, while "studies on the reliability" of the I.R.S. system appear to be the equivalent of environmental insult studies and proficiency testing.

In *Russo,* a mail fraud prosecution, the defendant complained on appeal "that he was not given an opportunity to prepare his defense to the computerized material used by the prosecution." In response, the Court of Appeals, citing *Stifel,* stated that in that case it had "held that if the Government uses highly sophisticated scientific evidence ... involving time consuming and

expensive laboratory tests, it must allow time for a defendant to make similar tests." 480 F.2d at 1241. In *Stifel* the Court had upheld admission of evidence based on neutron activation analysis, and its reference to allowing time for the defendant to conduct his own tests was dictum, and not made with reference to any issue that had been raised about the adequacy of pretrial discovery. 433 F.2d at 441. Thus, while *Stifel* and *Russo* indicate that the Sixth Circuit might have endorsed discovery similar to that being sought in this case as an adjunct to a determination of the admissibility of neutron activation analysis evidence, the issue of discovery was not directly before the court in either of those cases.

At most, in any event, the questions about discovery that may be lurking in the records of *Stifel* and *Russo* probably relate only to production of the government's specific test results, as the court appeared principally concerned with giving the defense sufficient time in which to conduct its own pretrial tests. This view of *Stifel* and *Russo* is supported by the Second Circuit's decision in *United States v. Kelly*, 420 F.2d 26, 29 (2d Cir.1969), in which the court held that delayed disclosure of the government's neutron activation analysis test results had deprived the defense of "the opportunity to weigh conflicting claims as to its reliability," because "fairness requires that adequate notice be given the defense to check the findings and conclusions of the government's experts."

At issue in this case, as in *Liebert*, and unlike *Stifel*, *Russo*, and *Kelly*, are not the results of tests relative to the particular defendant; what is sought, rather, is discovery of information and materials that are the predicate on which the individual tests and evaluation were conducted. As noted the Seventh Circuit's opinion in *Liebert* suggests that the court considered discovery of analogous materials to be appropriate. 519 F.2d at 547.

Stronger support for the discovery being sought by the defendants comes, in any event, from the Second Circuit's decision in *United States v. Dioguardi*, 428 F.2d 1033

(2d Cir.1970). In that case the defendants had been convicted of bankruptcy fraud, and the government's case had included computer generated evidence relating to the dates on which inventory had been shifted by the defendants from the bankrupt company to another firm controlled by them. The data that had been used to program the computer before it produced the inculpatory results had not been provided during discovery. Though the court concluded that such failure was attributable to unclarity in the defendants' request, it expressed clearly its views about pretrial discovery of predicate materials:

> We fully agree that the defendants were entitled to know what operations the computer had been instructed to perform and to have the precise instructions that had been given. It is quite incomprehensible that the prosecution should tender a witness to state the results of a computer's operations without having the program available for defense scrutiny and use on cross-examination if desired. We place the Government on the clearest possible notice of its obligation to do this and also of the great desirability of making the program and other materials needed for cross-examination of computer witnesses, such as flow-charts used in the preparation of programs, available to the defense a reasonable time before trial.

428 F.2d at 1038. Thus, it appears that the Second Circuit in *Dioguardi* expressly endorsed pretrial discovery of background materials that were functionally equivalent to the materials being sought in this case.

Such discovery is also supported by the decision in *United States v. Countryside Farms*, 428 F.Supp. 1150 (D.Utah 1977), a criminal anti-trust prosecution interpreting the phrase in the then-current version of Rule 16(a)(1)(C), "documents to be used by the government in its case in chief" (which presently reads "intended for use by the government as evidence in chief at trial"), "to include documents which will be marked and offered in evidence by the government, plus documents which will be relied on or referred to in any way by any witness called by the government during

its case in chief." 428 F.Supp. at 1149. This conclusion has been described as a "sensible interpretation" of this phrase. *United States v. Turkish*, 458 F.Supp. 874, 882 (S.D.N.Y.1978).

In this case, I expect that the government's presentation at the in limine hearing will include not only evidence about the individual test and results relative to the defendant Bonds, but also, of necessity, will encompass substantial testimony and evidence about the general procedures that were followed and the standards that were applied (i.e., the material introduced by the government will include the items, or most of them, that are being sought by the defense (which I have termed "predicate material")). The decision in *Countryside Farms* clearly supports granting pretrial discovery of this material, at least for the purposes of effective cross-examination. *See also* Weinstein's Evidence 703[4] (The problem of whether a defendant has the right under the confrontation clause to cross-examine the persons who prepared the underlying data on which an expert relies "should be resolved by giving the defendant access, at a pretrial conference, to the hearsay information relied upon by the expert, thereby making effective cross-examination possible.... If the defendant wishes to see the underlying documents they should be made available to him").

■ I conclude, therefore, that predicate materials relied on by experts who testify in support of admission of novel scientific evidence are encompassed within the provisions of Rule 16(a)(1)(C), which authorizes pretrial disclosure of documents intended for use by the government as evidence in chief at trial. The authorities cited by the government to the contrary are not persuasive.

In *United States v. Iglesias*, 881 F.2d 1519 (9th Cir.1989), the Ninth Circuit held that notes of a DEA agent who conducted tests on suspected heroin were not subject to discovery, as such notes were neither tests nor the results of tests. Though this interpretation of Rule 16(a)(1)(D) was vigorously disputed by the dissent, the important aspect of this case that distinguishes

the request here from that that had been made there is that in *Iglesias* it appears to have been entirely possible for the defense to have conducted its own tests on the material. In addition, the defendant in that case was not seeking disclosure of the predicate procedures and standards that had been followed; it was, rather, seeking materials that were collateral to the individual test that had been performed.

Other cases rejecting superficially similar requests are also distinguishable. Thus, in *United States v. Hensel*, 699 F.2d 18 (1st Cir.1983), the First Circuit denied discovery of DEA and Department of Justice materials relating to marijuana smuggling where the agent had not indicated that his opinions were predicated on such documents. Similarly, in *United States v. Fuel*, 583 F.2d 978 (8th Cir.1978), the Eighth Circuit held that discovery could not be had of a government expert's rough notes and other documents where the expert had not used those materials in dictating his report. In the instant case, in contrast, it is expected that the predicate materials that are being sought by the defendants will be an important aspect of the government's foundation evidence, and thus will be used and referred to by the government's witnesses at the in limine hearing.

The remaining case that provides support to the government's position is *United States v. Orzechowski*, 547 F.2d 978 (7th Cir.1977), in which the Seventh Circuit rejected the defendant's claim, made on the basis of Rule 16(a)(1)(D) and *Brady*, that he had been entitled to discovery of DEA materials relative to the means and tests by which isomers of cocaine could be ascertained and distinguished. Those materials appear to be equivalent to the predicate materials at issue in the present case.

The court held that the materials were outside the scope of Rule 16(a)(1)(D) because the tests being sought by the defendants in that case had not been conducted with reference to their prosecution. It also concluded that the materials had not been available under either the rule or *Brady* because they were not "material to the preparation of the defense." A showing of materiality, in the court's view in *Orze-*

**636**

*chowski,* necessitated a determination that the materials, if available to the defense, would have enabled him to alter substantially the quantum of proof at trial. 547 F.2d at 984.

Since that decision, the Supreme Court has defined materiality as a showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). It cannot be reasonably argued in this case, I am persuaded, that the predicate materials sought by the defense are not material, as that term is used in Rule 16(a)(1)(C). As noted at the outset of this opinion, counsel for the defendants have raised reasonable and bona fide issues concerning the reliability of the standards and procedures leading to the proposed evidence in this case. If they prevail in their challenge to the government's proffer of that evidence, the likelihood of conviction will be diminished substantially, if not eliminated. The opportunity for the defendants to make an effective challenge, and, more importantly, the ability of this court to resolve the issue of admissibility fairly, depend on prehearing access by defense counsel and their experts to the materials that are the subject of their discovery request.

■ I conclude therefore, that the motion of the defendants for discovery of the specific materials designated by the defendants during the hearing on February 1, 1990, and which have been referred to herein as matching criteria, environmental insult studies, population data, and proficiency tests should be granted. It is, accordingly,

ORDERED THAT the motion of the defendants for discovery of matching criteria, environmental insult studies, population data, and proficiency tests as specified at the February 1, 1990, hearing be, and the same hereby is granted.

So ordered.