983 F.2d 1067
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Mary LIGGONS, Plaintiff-Appellee,
v.
ROEHM GMBH; R.G. Industries, Inc., Defendants-Appellants.
 No. 91-1809.
 United States Court of Appeals, Sixth Circuit.
 Jan. 20, 1993.
 
 Before RALPH B. GUY, Jr., and ALAN E. NORRIS, Circuit Judges, and JOHN W. PECK, Senior Circuit Judge.
 RALPH B. GUY, JR., Circuit Judge.
 
 
 1
 Defendants, Roehm GMBH and R.G. Industries, Inc. (Roehm or defendants), appeal the denial of their motion for judgment notwithstanding the verdict and denial of their motion for a new trial in this products liability diversity action for injuries arising from the discharge of a handgun. The only question for our determination is whether the plaintiff introduced sufficient evidence to identify Roehm as the manufacturer of the discharged gun. The district court concluded that although plaintiff had not established to a certainty that defendants had manufactured the handgun that caused the injury, plaintiff had produced sufficient evidence to raise a jury question. Given the standard under which we review denial of j.n.o.v. motions, we affirm.
 
 I.
 
 2
 Plaintiff, Mary Liggons, was injured when a handgun was dropped by an unidentified person attending a Weight Watchers meeting in Southfield, Michigan. The gun struck the floor and discharged, and a bullet struck Liggons and lodged in the ceiling. Neither the gun nor its owner was ever identified, but police did recover the bullet.
 
 
 3
 With the testimony of four witnesses, Liggons attempted to establish that the defendants manufactured the gun which discharged. The first witness, a woman present at the Weight Watchers meeting on the day in question, testified that she observed a woman reach down and pick up an object from the floor after a shot was fired. The object appeared to be a gun, according to the witness, and the unidentified woman placed the gun into her purse. The witness further testified that the gun was like a "little derringer"; it appeared to be a "ladies gun"; it was "silver"; and the handle was "white, like a pearl." (App.Vol. I at 67, 71).
 
 
 4
 The next witness on the issue of product identification attempted to establish that the defendants manufactured the gun in question largely through analysis of the recovered bullet. Stanton Berg, the first of plaintiff's firearms identification experts, examined certain class characteristics found on the bullet and matched those class characteristics to certain barrels in an attempt to narrow the field of potential manufacturers of the handgun. Berg relied on his own data base of manufacturers of firearms in this case, and his data base consisted of entries from three primary sources: (1) the FBI General Rifling Characteristics File manual (GRCF); (2) various handbooks and publications; and (3) his own examination of firearms since 1947.
 
 
 5
 The class characteristics of the barrel that may have fired the bullet were identified according to the number of lands and grooves (ten), the spin or direction of the twist of the rifling (right hand), and the caliber of the firearm (.38). Berg then opined that the absence of skid marks or noncoincidental rifling marks on the bullet meant that the bullet was fired from a derringer and not a revolver.
 
 
 6
 Berg then turned his attention to his own data base. He found approximately 83 derringers which possessed the same class characteristics as the bullet in question. Of those 83, approximately 75 were manufactured by Roehm.[1] Berg acknowledged that he did not know who manufactured the remaining eight derringers; they were listed only by their two distributors, Hawes and Herters. However, he did conclude that the Hawes derringers were manufactured by defendants because the one Hawes weapon which Berg did examine contained a "proof mark"--a stamp by a proofing house which tests guns for safety before distribution--from the Ulm proof house, which is located very near to the Roehm factory in Germany. Having never examined a Herters derringer because of its relative rarity, Berg could not render an opinion regarding which manufacturer of derringers sold to the Herters distributor. Based on that evidence, Berg concluded that the defendants manufactured the weapon in question.
 
 
 7
 On cross-examination, Berg acknowledged that in forming his opinions he concluded that the derringers distributed by Hawes and Herters were manufactured by Roehm. Neither Berg nor any of defendants' witnesses provided a specimen of either the Hawes or Herters gun.
 
 
 8
 Plaintiff's next witness, Lama Martin, was qualified by the district court as a forensic firearms identification expert. Martin obtained eight test bullets from derringers with the same class characteristics as the bullet in question, and took comparison photographs of all nine bullets. Seven of the eight test bullets were obtained from Roehm derringers, and the other bullet was obtained from a revolver with an Apex custom-made barrel which possessed the same class characteristics. Through the use of a scanning electronic microscope (SEM), Martin analyzed the bullets and found that eight of the nine bullets had a unique land impression. The only bullet which did not have the same particular land impression was fired from the Apex custom-made barrel. Thus, Martin concluded that the gun which fired the bullet in question "in all probability" was manufactured by Roehm.
 
 
 9
 Martin testified that he was unable to locate a derringer distributed by Hawes or Herters for comparison purposes. Indeed, he admitted that, until he examined bullets from Hawes and Herters derringers, he could not rule them out as being the type of gun that fired the bullet in question. However, he stated that, "assuming that the Hawes and Herters are Roehm, my conclusion will remain the same." (App. 599).
 
 
 10
 The final witness for plaintiff, a forensic firearms consultant named William Welch, was retained by Martin to obtain the bullet specimens which Martin analyzed. After Welch located the bullets, he took photos which he turned over to Martin. Welch concurred in Martin's assessment that the Apex custom-made barrel could be excluded from consideration because it produced a bullet much different than those fired from the Roehm derringers.
 
 
 11
 Defendants presented one expert, Lucean Haag, who agreed generally that the subject bullet contained ten lands and grooves and a right hand twist and was fired from either a .38 or .357 caliber gun. Unlike the plaintiff's experts, he did not eliminate revolvers as a possible source of the subject bullet. In addition, Haag identified manufacturers and distributors other than Roehm which employed a barrel with the same class characteristics as the bullet in question. This testimony coincided with defendants' argument that the derringer barrel is a component part purchased by defendants from a different manufacturer who also sells barrels to other gun manufacturers. Many of these guns were not contained in Berg's data base. Haag also produced a derringer which had an Ulm proof house stamp and possessed the same class characteristics as the bullet in question. The derringer had a diamond imprint and it was named "Kaschie." Haag testified that the gun was manufactured by the Karl Schieder Company.
 
 
 12
 Defendants presented two other witnesses. The first, Peter Clouet, was an employee of Roehm, and he testified that Roehm never manufactured derringers for Hawes or Herters. The second witness, a law clerk from defendants' law firm, visited the Bureau of Alcohol, Tobacco and Firearms shortly before trial and examined a Herters distributed weapon which had the same class characteristics as the bullet in question. The weapon had a diamond shaped manufactured label and an imprint of "Kaschie."
 
 
 13
 On appeal, the defendants challenge the adequacy of the plaintiff's product identification evidence on several grounds. In addition, defendants oppose the trial court's decision to qualify Martin as an expert.
 
 II.
 
 14
 The Sixth Circuit adheres to the rule that a federal court sitting in a diversity case must apply state law standards for granting directed verdict and j.n.o.v. motions. Lewis Refrigeration Co. v. Sawyer Fruit, Vegetable & Cold Storage Co., 709 F.2d 427, 430 n. 3 (6th Cir.1983). When faced with a motion for j.n.o.v., Michigan courts must view the evidence in a light most favorable to the nonmoving party, and "[i]f the evidence is such that reasonable men could differ, the question is one for the jury and judgment notwithstanding the verdict is improper." May v. William Beaumont Hosp., 448 N.W.2d 497, 504 (Mich.App.1989). Only where, as a matter of law, insufficient evidence exists to make an issue for the jury is j.n.o.v. proper. Willoughby v. Lehrbass, 388 N.W.2d 688, 699 (Mich.App.1986).
 
 
 15
 In a Michigan products liability action, "the threshold requirement ... is identification of the injury-causing product and its manufacturer." Abel v. Eli Lilly & Co., 343 N.W.2d 164, 170 (Mich.), cert. denied, 469 U.S. 833 (1984). Identification must be established by a preponderance of the evidence. Caldwell v. Fox, 231 N.W.2d 46 (Mich.1975).
 
 
 16
 At the outset, defendants challenge the admissibility of Berg's data base because it allegedly lacks sufficient foundation to base an opinion on product identification. Next, defendants contend that the trial court improperly recognized Martin as an expert. Then, even if Berg's data base and Martin's testimony are considered admissible, defendants argue that insufficient evidence existed on the question of product identification.
 
 
 17
 Defendants' preliminary arguments are answered rather quickly. Under the Federal Rules of Evidence, factual information which serves as the basis for an expert's opinion must be "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed.R.Evid. 703. We do not disturb a district court's decisions in this area absent an abuse of discretion. United States v. Vance, 871 F.2d 572, 577 (6th Cir.), cert. denied, 493 U.S. 933 (1989).
 
 
 18
 Like other firearms identification experts, Berg compiled his data base from various sources, including the FBI's list of rifling characteristics, trade magazines, and Berg's own experiences. See United States v. Ware, 914 F.2d 997, 1003 (7th Cir.1990) (where data relied upon by expert in identifying the manufacturer of a gun included various publications, markings on the shotgun, and trade books, trial court did not abuse its discretion in permitting expert to testify because experts in the field rely on this type of information and such reliance is reasonable). As in Ware, the foundation for Berg's testimony was properly laid. The district court did not abuse its discretion.
 
 
 19
 Similarly, in qualifying Martin as an expert and permitting him to testify on the question of identification through use of his scanning electron microscope, the district court did not abuse its discretion. Defendants challenge Martin's qualifications, and also characterize his use of a SEM as a new and novel scientific method which has not been accepted by the scientific community. However, Martin has over 30 years of experience working with guns, heads his own consulting firm, and has been qualified as an expert countless times in state and federal courts. Defendants' questions regarding Martin's formal education and his failure to publish articles in gun periodicals, then, reflect more on the weight accorded Martin's testimony rather than its admissibility. See Mannino v. International Mfg. Co., 650 F.2d 846, 851 (6th Cir.1981) ("[T]he only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth. The weight of the expert's testimony must be for the trier of fact.").
 
 
 20
 Further, Martin's use of a SEM was not so new and novel that it required the blessing of the larger scientific community. Examining the characteristics of a bullet to determine the type of gun from which it was fired is well accepted. Martin simply elected to undertake this examination with a microscope that had more power than those used by many others. See United States v. Stifel, 433 F.2d 431, 438 (6th Cir.1970), cert. denied, 402 U.S. 994 (1971) ("Appellant's witnesses' criticisms of Scott's test methods were fully developed before the jury and were appropriate for that body's consideration. Such rebuttal evidence went to the weight of Scott's testimony--not to its admissibility.").
 
 
 21
 Next, we turn to defendants' contention that the evidence adduced at trial, even if admissible, failed to establish by a preponderance of the evidence that defendants manufactured the gun in question. Two Michigan cases deal explicitly with the problem of product identification. See Cheli v. Cudahy Brothers & Co., 255 N.W. 414 (Mich.1934), overruled on other grounds, Hill v. Husky Briquetting, 233 N.W.2d 290 (Mich.1974); and Wines v. Crosby & Co., 135 N.W. 96 (Mich.1912). In both cases, defendants argued that the plaintiff had not established their identity with the injury-causing product. And, in both cases the Michigan Supreme Court determined that the plaintiff had introduced enough evidence to support a jury verdict of liability.
 
 
 22
 In Cheli, plaintiff's wife had died from eating diseased pork, and plaintiff sued Cudahy Brothers, the alleged supplier of the pork. The Iron Mountain, Michigan, grocery store where plaintiff's wife bought the pork itself purchased pork butts only from Armour & Company and Cudahy Brothers. The court found evidence that Cudahy Brothers had supplied pork to the grocery at around the time that the decedent purchased pork, and it also found that the box in which the pork was packed contained a Cudahy label. Cheli, 255 N.W. at 415. Further, Armour & Company, the only other possible supplier of the pork, made infrequent deliveries to its branch warehouses in Iron Mountain during the month when decedent purchased the pork. Id. This was deemed sufficient to establish Cudahy as the supplier of the pork.
 
 
 23
 The plaintiff in Wines was injured when polish that she put on her stove caught fire. The stove polish was known as "6-5-4, Self Shining Lusta." Wines, 135 N.W. at 96. Plaintiff testified that she personally purchased the "6-5-4" stove polish, and her suit alleged that the defendants manufactured the product in question. The Michigan Supreme Court did not discuss how it reached its conclusion that the defendants did manufacture the stove polish, but the court concluded that sufficient "evidence tending to show" the identity of the defendant as the manufacturer of the polish existed to allow the jury to act. Id.
 
 
 24
 Similarly, in this case, plaintiff has produced evidence "tending to show" that defendants manufactured the gun in question. Liggons produced two independent experts who reached the same conclusion identifying Roehm as the manufacturer of the gun in question after utilizing different methodological approaches. Coupled with the testimony of the eyewitness at the Weight Watchers clinic, Liggons produced sufficient evidence to allow the case to go to the jury.
 
 
 25
 AFFIRMED.
 
 
 
 [1]
 The record is not altogether clear regarding how many of the 83 derringers found on Berg's data base were actually identified as Roehm derringers. At one point, defense counsel objected to Berg's testimony because "he has identified about seventy nine Derringers, of which seventy two are Roehm, six are Hawes and two are, one or two are Herters handgun[s]." Later, Berg testified that he had found 83 derringers, some of which were distributed by Hawes and Herters. For our purposes, it matters not the exact number of derringers identified